MUSIC SALES CORPORATION, and Tempo Music Corporation, Plaintiffs,

v.

Gregory MORRIS, individually and/or as Executor of the Estate of Billy Strayhorn, et al., Defendants.

No. 98 Civ. 9002(SAS).

United States District Court, S.D. New York.

Aug. 19, 1999.

---

R. Andrew Boose, Marcia B. Paul, William H. Crosby, Jr., Kay Collyer & Boose, LLP, New York City, for plaintiffs.

Dorothy M. Weber, Shukat Arrow Hafer & Weber, LLP, New York City, for defendants.

**OPINION AND ORDER**

SCHEINDLIN, District Judge.

## I. Introduction

Plaintiffs Music Sales Corporation ("Music Sales") and Tempo Music Corporation ("Tempo") seek a declaratory judgment that they are the rightful owners of the copyrights to certain musical compositions.[1] Defendants Gregory Morris and the Estate of Billy Strayhorn, et al.,[2] similarly seek a judgment that they are the rightful owners of the same copyrights. Defendants move, and Plaintiffs cross-move, for summary judgment pursuant to Fed.R.Civ.P. 56.

For purposes of summary judgment, Plaintiffs and Defendants stipulate to all material issues of fact.[3] *See* Plaintiffs' Statement Pursuant to Local Rule 56.1(a) ("Pl.56.1"); Defendants' Statement Pursuant to Local Rule 56.1(a) ("Def.56.1"). For the reasons that follow, the parties' opposing motions for summary judgment are granted in part and denied in part.

## II. Jurisdiction

This Court has federal question jurisdiction over this dispute because the issues presented arise under the Federal Copyright Act, 17 U.S.C. § 304.

## III. Background

### A. The 1962 Agreement and Amendment

Billy Strayhorn ("Strayhorn") (1915–1967) was a successful jazz composer and performer who created hundreds of songs during his lifetime, including such well-

1. Plaintiffs additionally seek to exclude, on summary judgment, the affidavit of Defendants' expert witness, William Patry, on the grounds that expert testimony on the interpretation of domestic law is not admissible.

2. The members of the Estate are Adrienne Claerbaut, Cheryl Chakrabarti, Keith Conaway, Donna Davis, William Strayhorn, Deborah Strayhorn, Carol Strayhorn, Lawrence Strayhorn, James R. Strayhorn, Sr., Leslie M. Demus, Lillian Strayhorn (Demus) Dicks ("Dicks"), and Susan Strayhorn. With the

exception of Dicks, who is the sole surviving sibling of Billy Strayhorn ("Strayhorn"), the parties are the heirs and successors to the copyright interests possessed by Strayhorn's siblings, who inherited these rights from Strayhorn.

3. There is a factual discrepancy between Plaintiffs and Defendants as to when Plaintiffs became aware of a particular copyright termination notice. As discussed below, this discrepancy is not material because it does not affect the validity of that notice.

known hits as "Take the A Train" and "Chelsea Bridge." Throughout the 1940s, Strayhorn received copyright registrations in various of his works ("Strayhorn Compositions" or "Compositions"). *See* Amended Complaint ¶ 24; Answer ¶ 24. These copyrights, in accordance with the 1909 Copyright Act then in force, received an initial copyright term of 28 years and a potential additional term, known as a renewal term, of 28 years, contingent upon the author, his agent or executor, or his statutory heirs, filing for the renewal.

In 1962, Strayhorn executed an agreement ("1962 Agreement") with Tempo, a music publisher, assigning to Tempo whatever interests he held in the renewal rights of certain of the Strayhorn Compositions. *See* 1962 Agreement, Exh. A to 3/18/99 Affidavit of Gregory Morris, Executor of Strayhorn Estate ("Morris Aff."). All of Strayhorn's potential heirs, including his parents ("Parents") and siblings ("Siblings"), also signed the 1962 Agreement, assigning to Tempo whatever interest they might have had in the renewal rights of the Compositions.[4] *See id.* Gregory Morris ("Morris"), Strayhorn's nephew, did not sign the 1962 Agreement. *See* Morris Aff. ¶ 6. In consideration for assigning these rights, Strayhorn, his Parents, and the Siblings received ten shares of stock in Tempo and future royalties. *See* 1962 Agreement; Plaintiffs' Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment and in Support of Cross–Motion for Summary Judgment and to Strike ("Pls.Mem.") at 2.

Three years later, on August 12, 1965, Strayhorn, his mother, and the Siblings, in return for additional consideration from Tempo, agreed to an amendment of the 1962 Agreement expanding the list of Compositions that the Agreement covered.[5] *See* Amended complaint ¶ 32 & Exh. C; Answer ¶ 32. As there are no

separate issues of law governing the questions that pertain to the 1962 Agreement and its 1965 Amendment, they will be referred to collectively as "the Amended 1962 Agreement". Morris did not sign the Amended 1962 Agreement. *See* Morris Aff. ¶ 11.

### B. Strayhorn's Will and Estate

Also in 1965, Strayhorn executed a last will and testament. In his will, he bequeathed his entire estate, but for a ring and a painting, to his mother, and appointed his nephew, Morris, as Executor. *See* Strayhorn Will, Exh. B to Morris Aff. In May of 1967, Strayhorn died, leaving behind neither a widow nor children. *See* Amended complaint ¶ 9. His mother, Lillian Strayhorn, predeceased him.

At the time of Strayhorn's death, the Compositions were in their initial copyright term. *See* Amended Compl ¶ 9; Morris Aff. ¶¶ 5, 10. Beginning in 1969, Morris, in his capacity as Executor, filed copyright renewal applications for each of the Compositions as they became eligible for renewal. These renewals included copyrights for Compositions covered by the Amended 1962 Agreement. *See* Morris Aff. ¶ 17. The parties do not dispute that copyrights in the Compositions have been renewed and are valid. *See* Amended complaint ¶ 25; Answer ¶ 25.

### C. The Ellington Agreement

In 1969, Morris, as Executor, and the Siblings, entered into an agreement with Duke Ellington, Inc. ("Ellington"), pursuant to which Ellington purchased the Siblings' Tempo stock for $100,000.[6] As Tempo's rights in the Compositions constituted an asset contributing to the value of Tempo's stock, the Ellington Agreement explicitly addressed those rights. Morris, as

---

**4.** Strayhorn's parents were James and Lillian Strayhorn. His five siblings were James Strayhorn, Jr., Georgia Strayhorn Conaway, Lillian Strayhorn Demus, John Strayhorn, and Theodore Strayhorn. .

**5.** Strayhorn's father, James, died prior to the execution of the Amended 1962 Agreement.

**6.** Tempo Music was founded by Duke Ellington but is a separate entity from Duke Ellington, Inc.

Executor, agreed to renew the copyrights of the Compositions and to assign them to Tempo as they entered the renewal term. The Ellington Agreement also specified that these assignments were pursuant to, and as agreed in, the Amended 1962 Agreement. *See* Stock Purchase Agreement ("Ellington Agreement"), Exh. D to Morris Aff. Finally, Morris agreed to assign previously-renewed copyrights in the Compositions to Tempo. *See id.; see also* Morris Aff. ¶ 20.

### D. Morris' Actions as Executor

In accordance with the Amended 1962 Agreement, the Ellington Agreement, and the will, Morris, as Executor, filed certificates for renewal of the Compositions. He, and in some instances the Siblings, assigned them all to Tempo (the "Short Form Assignments"). *See* Morris Aff. ¶ 15; Documents entitled Assignment of Renewal Copyrights ("Renewal Assignments"), Exhs. A & B to 4/9/99 Affidavit of William H. Crosby, Jr., Counsel for the Plaintiffs ("Crosby Aff."). These Renewal Assignments stated that Morris and the Siblings executed them pursuant to the 1962 Amended Agreement. *See id.*

In November 1976, Morris was discharged of any further liabilities relating to the Estate. *See* 11/12/76 Document of Surrogate's Court Releasing and Discharging Gregory A. Morris, Exh. H to Morris Aff. He retains to the present day the letters testamentary establishing him as Executor. There remains a question, however, as to whether Morris' discharge wholly terminated his responsibilities to the Estate or if he retained responsibility for the Estate, including the Compositions. This issue is discussed below.

### E. The Instant Dispute

In 1989, Morris, Dicks (the sole surviving Strayhorn Sibling), and the heirs of the deceased Siblings ("Heirs") sued Tempo in New York State court ("1989 Litigation") to obtain, *inter alia,* rescission of both the Amended 1962 Agreement and the 1969 Ellington Agreement because of their dissatisfaction with Tempo's performance in publishing and promoting the Strayhorn Compositions.[7] *See* Summons and Complaint in the Action of Susan Strayhorn, et al. v. Tempo Music Inc. and Ruth Boatwright, Exh. D to Crosby Aff. That Litigation proceeded through October 1993, when the parties agreed to a settlement.

The settlement agreement ("1993 Settlement Agreement"), executed between Tempo and Music Sales,[8] contained four major provisions relevant to this dispute [9]: (1) that Music Sales would receive a fifty percent interest in Tempo's rights in the Compositions and would assume sole rights to, *inter alia,* publish, promote, and distribute the Compositions; (2) that Music Sales pay Morris and the Strayhorn Estate $350,000 in satisfaction of their claims against Tempo; (3) that Music Sales pay the Strayhorn Estate and Morris continuing royalties and account to them annually; and (4) that Morris and the Heirs agree to the dismissal, with prej-

---

**7.** Morris, Dicks, and the Heirs alleged that Duke Ellington's sister, Ruth Ellington Boatwright, had assumed sole ownership and operation of Tempo but did not employ any staff, engage in any music publishing activities, or promote or generate royalties on the Strayhorn Compositions. *See* 3/1/88 Letter from Plaintiffs' Counsel to Defendants' Counsel, Exh. C to Crosby Aff.

**8.** Music Sales, a music publishing corporation, became aware of the dispute between Tempo and the Strayhorn Estate as well as similar disputes between Tempo and dissatisfied heirs and successors of other composers managed by Tempo. It offered to purchase Tempo's inventory of copyrights and to substitute itself as publisher in place of Tempo, assuming the relationships with the various composers' heirs and successors. The 1993 Settlement Agreement was therefore executed between Tempo and Music Sales with the approval of the Strayhorn Estate and the other parties in consideration for the dismissal by those parties of their claims against Tempo.

**9.** The Settlement Agreement also contains numerous other provisions relating to the works of other authors and the claims of those authors' successors. These provisions are not relevant to this dispute.

udice, of all their claims. *See* 11/9/93 Stipulation of Discontinuance and 10/18/93 Settlement Agreement between the Strayhorn Estate, Tempo, and Music Sales ("1993 Settlement Agreement"), Exhs. E & F to Crosby Aff.

Music Sales assumed responsibility for promoting the Compositions, accounted to Morris and the Siblings' estates, and paid Morris and the Heirs royalties as per the Amended 1962 Agreement. *See* 1993 Settlement Agreement. In contrast with Tempo's neglect of the Compositions, Music Sales has generated upwards of $250,000 in revenues annually from its promotion of the Compositions. *See* Letter of Barrie Edwards, President of Music Sales, to Herb Jordan, General Manager of Strayhorn Songs, Exh. A to Herb Jordan Declaration.

### 1. The 1993, 1998, and 1999 Termination Notices

In January 1993, Morris filed a notice of termination with the U.S. Copyright Office purporting to terminate Tempo's rights to the second .39–year renewal term in certain of the Compositions included in the Amended 1962 Agreement.[10] *See* 1/25/93 U.S. Copyright Office Certificate of Recordation ("1993 Termination Notice"), Exh. E to Morris Aff. Morris filed the 1993 Termination Notice several months prior to his consent to the 1993 Settlement Agreement with Music Sales in which he and the Heirs agreed to Tempo's transfer of fifty percent of its interest in the Compositions to Music Sales in exchange for initial and on-going compensation. Although there is no dispute that Tempo received notification of Morris' 1993 Termination Notice, it is unclear at what point Music Sales became aware of this Termination Notice. *See* 4/9/99 Affidavit of Barrie Edwards, President of Music Sales ("Edwards Aff.") ¶ 7; *but see* 1993 Letter from Counsel for Defendant to President and Counsel of Music Sales re: Strayhorn Extended Term Rights ("August 1993 Let-

ter"), Exh. A to Declaration of Gregory Morris ("Morris Decl.").

In 1996, Music Sales filed an objection to the sufficiency of the Notice with Defendants' counsel. *See id.* The validity of the 1993 Termination Notice is one of the issues raised in this dispute. *See* Amended complaint ¶¶ 63–74.

In 1998, Morris filed with the Copyright Office and served Music Sales and Tempo with a new termination notice, notifying them of the termination of their rights in all of the Compositions not included, and in some of the Compositions included, in the 1993 Termination Notice. *See* 1998 Termination Notice ("1998 Termination Notice"), Exh. F to Morris Aff.

### 2. Music Sales and Tempo Protest Termination Notices

Upon their receipt of the 1998 Notice, Music Sales and Tempo commenced the instant action against Morris and the Estate contesting the Termination Notices and seeking a declaratory judgment that the Defendants have no ability to terminate Plaintiffs' rights in the Compositions. Subsequent to their receipt of the Complaint, Music Sales and Tempo received ten additional termination notices, some executed by Dicks and some executed jointly by Dicks and Morris. *See* 1999 Termination Notices ("1999 Termination Notices"), Exh. G to Morris Aff. Music Sales and Tempo then served an Amended Complaint including challenges to the 1999 Notices. *See* Affidavit of Dorothy Weber, Counsel for the Defendants, of March 19, 1999, ("Weber Aff."), Exh. C to Amended Complaint.

### IV. Summary Judgment

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

---

**10.** As explained *infra* Part V.A., subsequent amendments to the Copyright Act added a second renewal term of 39 years to the life of artistic and literary copyrights.

ty is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is material if its resolution could affect the outcome of the dispute. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Converse v. General Motors Corp.,* 893 F.2d 513, 514 (2d Cir.1990). The moving party has the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

In determining whether summary judgment should be granted, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *See D'Amico v. City of New York,* 132 F.3d 145, 148 (2d Cir.1998). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party on a material issue of fact, summary judgment is improper. *See Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997); *see also Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). The court must also examine "the substantive law applicable to the underlying litigation since that law dictates which facts are material." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

## V. Applicable Copyright law

The instant dispute concerns events that have unfolded over nearly forty years. During this period, copyright law has changed several times. The 1909 Copyright Act, 17 U.S.C. § 24, was the law in force during Strayhorn's life and death, when the Strayhorn Siblings and Morris executed contracts with Tempo, and when Morris assumed executorship of the Strayhorn Estate. In 1976, Congress significantly amended the 1909 Act, creating the 1976 Copyright Act, 17 U.S.C. § 304. The 1976 Act contains extensive retroactive provisions governing works executed prior to the Act's effective date of January 1, 1978. These provisions supercede those of the 1909 Act; thus, the 1976 Act is controlling in determining the title to and disposition of the Compositions in this dispute.[11]

In 1999, Congress amended and altered the Act with the Sonny Bono Copyright Term Extension Act. *See* Pub.L. 105–298 (Oct. 27, 1998) ("Bono Act"). There are three provisions central to the copyright law and of importance to this dispute. These are: (1) the duration of copyrights; (2) the right of certain parties to terminate the assignment of a copyright (a "termination right"); and (3) the heritability of copyrights and associated renewal and termination rights.

### A. Duration of Copyright

The current copyright term for works created prior to January 1, 1978, is ninety-five years. This overall term is made up of three shorter terms: an initial term of twenty-eight years from the time of the work's creation or publication (whichever is later); an initial renewal term of twenty-eight years; and a final renewal term of thirty-nine years. This somewhat complex scheme results from the sequential modification of the first American copyright act, the Copyright Act of 1790, which established an original copyright term of fourteen years and a renewal term of fourteen years. The 1790 Act also created a "renewal right" that allowed the author to reclaim his or her copyright at the end of the first period in order to renegotiate its assignment. The 1831 and 1909 Acts lengthened the initial term and renewal terms to twenty-eight years each. The 1976 Act then extended the total length of

---

**11.** The 1909 Act and 1976 Act, though differing in language, would not produce different outcomes to this dispute. Defendants contend that the 1909 Act should be applied to the analysis of the inheritance of the rights and of the validity of the contracts. Defendants are incorrect. Nonetheless, were the Court to apply the 1909 Act, the outcome would be no different.

copyright for works created prior to January 1, 1978, from fifty six to seventy-five years by adding a second renewal term of nineteen years. The 1976 Act granted the author a right to terminate his or her assignment of the renewal period—a "termination right"—in order that the author or the author's successors in interest could reclaim the copyright for the additional nineteen years.[12] The Bono Act extended copyrights for literary and artistic works to their current ninety-five year term.

The Bono Act did not follow the pattern of the 1909 and 1976 Acts in their creation of a separate term with associated renewal or termination rights; it merely extended the length of second renewal term established in the 1976 Act. However, the Bono Act modified the application of the renewal and termination provisions to the second renewal term by allowing the author or successor to exercise a termination right for the twenty years that the Act added onto the term—provided the author or successor(s) had not previously exercised the termination right. *See* Bono Act, Pub.L. 105–298 (Oct. 27, 1998).

### B. Purpose and Operation of Renewal Rights

#### 1. Purpose of Renewal Rights

■ The policy behind the statutory creation of renewal rights and the heritability of those rights is to ensure an opportunity for the author to reclaim the copyright of a work that s/he may have been forced by hardship to sell during the work's first term for an unjustly small sum. The two renewal terms create two chances subsequent to the author's original assignment of the copyright for him or her to extract the work's fair value. The statutorily-created opportunities to renegotiate reflect the constitutional basis of intellectual property rights: that such rights exist not to remunerate those who trade in creative works or otherwise hold the property right by assignment but as an incentive to authors and inventors to make their works available to the public. *See* U.S. Const., art. I, § 8, cl. 8.

#### 2. Operation of Renewal Rights

The policy underlying the creation of renewal rights influences the extent to which the author is free to contract away those rights or to bequeath them. Under the 1909 and 1976 Acts, the author may, during the first term of the copyright, assign his or her expectancy of the renewal rights to a third party by contract. If the author survives until the time the renewal copyright vests, then the assignment to the third party is binding (although terminable through exercise of the termination right, discussed *infra* Part V.C.2.). *See Stewart v. Abend*, 495 U.S. 207, 219, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990) (discussing *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960)).

However, should the author die while the work is in its first term, the rights to future renewal copyrights do not follow contractual or testamentary dispositions made by the author. Instead, regardless of prior assignments by the author, the expectancy of the renewal rights vests in the categories of persons enumerated by the Copyright Act: the author's widow(er) and children, the author's executor if the "widow, widower, or children are not living," or, "in the absence of a will," the author's next of kin.[13] 1976 Act, 17 U.S.C.

---

**12.** The termination right differs from the renewal right in that the renewal right allows the author or the author's successors in interest to recapture the copyright at the commencement of the renewal term while the termination right allows the author or the author's successors to terminate the assignment of the renewal. The renewal right has been called a "second bite at the apple"; the termination right could be called the third.

**13.** The 1976 Act states that the parties entitled to the renewal and extension of the copyright are:
 (i) the author of such work if the author is still living,
 (ii) the widow, widower, or children of the author, if the author is not living,
 (iii) the author's executors, if such author, widow, widower, or children are not living, or

§ 304(a)(1)(C). *See also Stewart,* 495 U.S. at 219, 110 S.Ct. 1750; *Miller Music,* 362 U.S. at 375, 80 S.Ct. 792 ("[T]he author had only an expectancy to assign; and his death, prior to the renewal period, terminates his interest in the renewal which ... vests in the named classes").[14] Where the statutory heirs have assigned their expectancy interest to a third party during the author's lifetime, that assignment is binding on them. However, the validity of the assignment does not prevent them from exercising the termination right over the extended renewal term.

### C. Purpose and Operation of Termination Rights

#### 1. Purpose of Termination Rights

■ The 1976 Act created an additional opportunity for the author or the author's heirs to extract the fair value of the work: For transfers of renewal rights effected prior to January 1, 1978, it provides the author or the author's successors with the right to terminate a transfer and reclaim the rights. *See* § 304(c). The termination right is structured to match the renewal right. Like the renewal expectancy, it passes from the author to the statutory heirs upon the author's death. *See id.*[15] However, unlike the renewal rights, the termination right is inalienable. Neither the author nor the statutory heirs may contract away their termination right and any contract provision that purports to assign that right is void. *See Stewart,* 495 U.S. at 230, 110 S.Ct. 1750 ("The 1976

Copyright Act provides ... an inalienable termination right"). Congress resorted to the extraordinary measure of creating an inalienable right in order to ensure that the author's heirs would be able to terminate any contingent grants of renewal rights made during the author's lifetime. The House Reports reveal the legislators' view that, under the 1909 Act, "a great many contingent transfers of future renewal rights have been obtained from [statutory heirs] .... A statutory beneficiary who has signed a disadvantageous grant of this sort should have the opportunity to reclaim the extended term." H. Rep. p. 141.

#### 2. Operation of Termination Rights

Terminations may be "effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured." 17 U.S.C. § 304(c)(3). This means that the termination right applies to the second renewal period, the thirty-nine year term commencing at the end of the fifty-six year term. The termination right does not give the author or heirs freedom to cancel their contracts at any time. If the author or the author's successor in interest do not exercise the termination right during this time period, the Bono Act enables them to terminate the grant of the renewal rights for the twenty years that Act added to the second renewal term.

(iv) the author's next of kin, in the absence of a will of the author.
17 U.S.C. § 304(a)(1)(C). The language of the statute in force at the time of Strayhorn's death, 17 U.S.C. § 24 (1909), is identical in substance to the current statute.

14. "[W]hen an author dies before the renewal period arrives, his executor is entitled to the renewal rights, even though the author previously assigned his renewal rights to another party." *Stewart,* 495 U.S. at 219, 110 S.Ct. 1750.
Explaining the transfer of the renewal rights, the Court quoted the legislative history of the 1909 Act: "The right of renewal is contingent. It does not vest until the end [of the original

term]. If [the author] is alive at the time of renewal, then the original contract may pass it, but his widow or children *or other persons entitled* would not be bound by that contract.'" *Stewart,* 495 U.S. at 219–20, 110 S.Ct. 1750 (quoting 5 *Legislative History of the 1909 Copyright Act,* Part K, p. 77 (E. Brylawski & A. Goldman eds.1976) (statement of Mr. Hale) (emphasis added)).

15. Section 304(c), governing termination rights, does not enumerate the parties who may succeed to and exercise the termination right but specifies them by reference to § 304(a)(1)(C), discussed *supra* Part V.B.2 in relation to renewal rights.

The author or the statutory heirs may effect the termination. The section of the statute applicable to the Compositions provides:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978 ... the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination ....

17 U.S.C. § 304(c). As elaborated above, the parties designated by subsection (a)(1)(C) consist of the author's spouse, children, executor, or, in the absence of a will, the next of kin. *See* 17 U.S.C. § 304(a),(c); *see also Stewart*, 495 U.S. at 224–25, 110 S.Ct. 1750; 3 *Nimmer on Copyright* (1st ed.1999) § 11.02[A], at 11–17.

█ Where the author has died without previously assigning the renewal copyrights, the rights pass to the statutory successors. Whoever assumes the renewal rights, and then assigns them, is also then free to terminate them. As the statute provides: "In the case of a grant executed by a person or persons other than the author, *termination of the grant may be effected by the surviving person or persons who executed it ....*" § 304(c)(1) (emphasis added).[16] Legislative history also supports the view that the heirs have the right to terminate their assignment of the renewal rights regardless of whether they made the assignment during the author's life or after the author's death. *See* H. Rep. pp. 140–141.

## VI. Discussion

The central question of this case, and one of first impression, is whether a statutory successor who has previously assigned the renewal rights to a third party may terminate that party's rights. To make this determination, it is necessary to first ascertain: (a) who, upon Strayhorn's death, inherited title to the Compositions; (b) if the party or parties who assumed those rights is able to exercise the termination right; and, if so, (c) if any of the terminations filed to date by Morris and Dicks meet the requirements for effectiveness.

### A. The Renewal and Termination Rights Vested in Morris

### 1. Morris is the Statutorily–Designated Successor to the Renewal and Termination Rights in the Compositions

█ Because Strayhorn died without either a widow or children, the statutory successor is the "executor" named in the will. *See* § 304(a)(1)(C). Based on this provision, Morris assumed the renewal and termination rights to the Compositions as Executor of Strayhorn's estate. The Siblings, as next of kin, would inherit directly only in "the absence of a will." Because Strayhorn had a will naming Morris as Executor, the Siblings were not entitled to inherit the rights to the Compositions. This relatively straightforward conclusion merits elaboration. The correct reading of § 304(a)(1)(C) has engendered much commentary, as well as significant dispute between the parties in this case. Therefore, a more detailed analysis of the statute and of the case law follows.

Plaintiffs contest that Morris, as Executor, was the statutory successor. Instead, they argue that the Siblings, as next of kin, were entitled to inherit under the statute. Plaintiffs argue that the statute's provision that the author's rights vest in the executor where the author's widow(er) and/or children are "not living" means that the executor assumes the renewal rights only where the author had a spouse and/or children who lived at one time but have

---

**16.** Plaintiffs urge that the section of the statute that controls is § 304(c)(2) that states: "Where the author is dead, his or her termination interest is owned, and may be exercised" by the author's widow or widower, children, or grandchildren. If the foregoing "are not living," then the author's "executor, administrator, personal representative, or trustee shall own the author's entire termination interest."

predeceased the author. Plaintiffs contend that where an author had no spouse or children *ever* living, like Strayhorn, the rights pass to the next of kin.

Plaintiffs' reading contradicts Supreme Court precedent established in *Miller Music* and echoed in *Stewart* as well as legislative history regarding the purpose of the statute. In *Miller Music*, the Court clarified that the executor may assume the rights where the author never had a spouse or children by specifying that the executor claims "*absent* a widow [or widower] or child." *Miller Music*, 362 U.S. at 375, 80 S.Ct. 792 (emphasis added). In *Stewart*, the Court again stated that the executor may claim "absent" a spouse or child. *See Stewart*, 495 U.S. at 208, 110 S.Ct. 1750. Common sense and policy considerations also require the rejection of Plaintiffs' position: The renewal and termination rights exist primarily to benefit the author and his or her family; there is no more—and no less—reason for the executor to assume the rights where the spouse and children are dead than where they have never lived.

The interpretation of this passage that renders it consistent with the remainder of the statute and with congressional intent is that, where the author has a surviving spouse and/or children, those parties have priority in inheritance of the rights. Where the author lacks immediate family, however, the rights pass to the executor as a fiduciary for the next of kin or, in the absence of a will and executor, to the next of kin themselves.

Plaintiffs also argue that Strayhorn's next of kin, the Siblings, inherited the rights in the Compositions because Strayhorn died without a valid will. They rely on the phrase within § 304(a)(1)(C) specifying that "in the absence of a will" the next of kin inherit the rights. Plaintiffs admit that Strayhorn had a will and that the will was admitted to probate, but they assert that because the will made an invalid disposition of the Compositions, rights in them passed into intestacy. Equating intestacy with "the absence of a will," Plaintiffs assert that the next of kin inherited title to the Compositions and to the renewal and termination rights.

Precedent instructs that where the author's will fails to effectively dispose of the copyrights, the author is *not* considered to have died "in the absence of a will."[17] *See Miller Music*, 362 U.S. at 374, 80 S.Ct. 792. The Supreme Court held in *Miller Music* that where an author's will contained no specific bequest concerning renewal rights, the rights accrued to the executor. *See id.* Following *Miller Music*, this Court held in *Capano Music* that the interests in copyrights vest in the executor of the author's will but did not hold that the will must cover the copyright interests. *See Capano Music, a Div. of Britone, Inc. v. Myers Music, Inc.*, 605 F.Supp. 692, 695 (S.D.N.Y.1985). According to *Capano*, the operative fact is that an executor oversees the administration of the interests, not that the will effectively specify the ways in which the interests be administered.[18],[19] *See id.* This holding is fa-

---

**17.** Strayhorn's will did not effectively dispose of the rights to the Compositions because he left his estate to his mother Lillian, who predeceased him.

**18.** An ineffective specification may cause the rights to pass into intestacy. *See* 3 *Nimmer* § 9.04[C] at 9–64.3, *op cit.* Barbara Ringer, *Renewal of Copyright*, Copyright Office Study No. 31, n. 10, at p. 158–59 (1960).

**19.** The *Capano Music* court also implies this through finding the converse: that where there is a valid will but no executor or appointed administrator to administer the interests, the copyright interests pass to the next of

kin because "'the interests must vest somewhere.'" *Capano Music*, 605 F.Supp. at 696, (citing *Silverman v. Sunrise Pictures Corp.*, 290 F. 804 (2d Cir.1923)). The operative principle, then, in the language "in the absence of a will" is a combination of the plain language of the statute and the existence of a party to oversee the administration of the interests. While it may be possible for the next of kin to inherit where there is a valid will but no executor, on the basis that it is necessary for some party to administer the interests, it is not possible for the next of kin to assume the rights where there is a will and an executor in place administering the rights. *But cf.* 3 *Nimmer* § 9.04[B], at 9–64.2–3 (stating that

tal to Plaintiffs' argument that, because the Strayhorn will made an ineffective bequest of the rights to the Compositions, Strayhorn died "in the absence of a will" for statutory purposes.

### 2. Morris Assumed the Rights as a Fiduciary

Defendants seek a declaration that Morris personally assumed the rights to the Compositions. This is also incorrect. As Executor, Morris assumed the rights in a fiduciary capacity for the next of kin. *See Capano Music*, 605 F.Supp. at 696 ("An executor or administrator *c.t.a.* claims a renewal right not for his own personal benefit but as fiduciary for the benefit of the author's legatees under the will."); *see also* 3 *Nimmer* § 9.04[B]. The next of kin may gain title from the executor only through assignment from the executor or a decree of distribution. *See Yardley v. Houghton Mifflin Co.*, 25 F.Supp. 361 (S.D.N.Y.1938), *aff'd*, 108 F.2d 28 (2d Cir. 1939); 3 *Nimmer* § 9.04[B].

### 3. Morris' Assumption of the Rights Invalidated Prior Assignments of the Renewal Expectancies Executed by Others

█ Although it is well-settled that the executor assumes the rights as a fiduciary and not personally, *see supra* Part VI.A.2., whether the executor is free to assign the interests as he or she chooses or must act to honor assignments made by the ultimate beneficiaries prior to the author's death remains an open issue. That issue is central to this dispute, since it affects whether Morris is bound to act in accordance with the Siblings' assignment of their rights and interests to Tempo. Plaintiffs contend that if the Siblings did not assume the rights directly, then Morris is at least bound to honor their assignments under the 1962 Amended Agreement.

where the author's estate has an executor but the renewal rights pass by intestacy, it "seems that" the next of kin "may" be entitled to the renewal rights).

Precedent indicates that the executor may act unfettered by the actions and desires of the beneficiaries. *Miller Music*, while acknowledging that an executor usually takes *cum onere* and must act to honor the commitments made by the testator or beneficiary, nonetheless held that the executor is not bound to honor commitments made prior to his or her assumption of the rights. *See Miller Music*, 362 U.S. at 376–77, 80 S.Ct. 792. In *Miller*, the Court set the rights and freedoms of the executor equal to those of the widow or widower, or children. *See id.*[20] *Miller Music* rejected an assertion of the kind made by Plaintiffs that "[t]here is quite simply nothing different, for copyright purposes than for any other purposes, about the rights and duties of an executor." Pls. Mem. at 14.

Morris' ability to act without regard to the prior assignments by the Siblings means that he is not bound to honor the Siblings' assignments of their renewal interests to Tempo under the 1962 Amended Agreement. However, this does not mean that Tempo and Music Sales, as successor to Tempo's interests, do not hold the rights to the Compositions: Morris made a binding assignment of the renewal rights to Tempo in the 1969 Ellington Agreement. Thus, whether Morris acted on his own initiative or pursuant to the Siblings' assignments under the 1962 Amended Agreement, the assignments of the renewal rights to Tempo are binding.

### B. The Grants are Terminable by Morris

#### 1. Morris was not Discharged as Executor

█ In order to determine whether Morris has or could terminate Tempo's and Music Sales' rights to the Compositions, it is first necessary to decide wheth-

**20.** This holding engendered several strong dissents asserting that the executor should act merely to execute existing assignments of the rights. *See Miller Music*, 362 U.S. at 378, 80 S.Ct. 792 (Harlan, J., dissenting, joined by Frankfurter, Whittaker, and Stewart).

er Morris is still Executor or has been discharged. Where the executor has served and is discharged, then s/he is no longer the proper party to claim the renewal. *See* 3 *Nimmer* § 9.04[B], at 9–64.1. After the executor is discharged, title to the rights and the ability to assign or terminate them devolves to the next of kin.[21] *See id.* If Morris' 1976 discharge were valid and complete, then the Siblings would have title to the rights together with the rights to renew and to terminate the assignment.

■ Two documents bear on Morris's status as Executor. The first, submitted by Plaintiffs, is entitled "Proceeding for Decree Releasing and Discharging Gregory A. Morris, as Executor of the Estate of William Strayhorn" ("Discharge Decree"). *See* 11/12/76 Discharge Decree, Exh. H to Pls. Notice of Motion. It states Morris is "discharged and released from all further liabilities to the persons interested in the Estate of William Strayhorn" and that it is "Ordered . . . [that Morris] is hereby released and discharged from all further liability as such Executor, to all of the persons who have executed acknowledged instruments approving said account . . . ." *See id.* The second document, presented by Defendants, is a letter from Surrogate's Court stating that Morris's letters testamentary have never been revoked. *See* 9/11/98 Certificate of Letters Testamentary, Surrogate's Court of New York, Exh. I to Morris Aff. A release and discharge in connection with an accounting does not extinguish the power of an executor; that Morris holds letters testamentary is conclusive evidence of his authority. *See Capozzola v. Oxman*, 216 A.D.2d 509, 628 N.Y.S.2d 777, 778 (2d Dep't 1995) (holding that the passage of 42 years and the release and discharge pursuant to an accounting did not compromise executrix's authority under valid letters testamentary); *see also* Surrogate's Court Procedure Act (SCPA) § 703(1) ("Letters granted by the Court are conclusive evidence of the

authority of the persons to whom they are granted.") Thus, Morris is the current and valid Executor and, as such, is able to exercise the termination right.

## 2. The Grants are Terminable

Based on the above discussion, it is clear that the grants are terminable. Because Morris assumed the termination rights as Executor, because he is not bound by the Siblings' ineffective assignments of their unfulfilled expectancies, and because he has not been discharged as Executor, Morris possesses the right to terminate the assignments of the rights in the Compositions. Whether Music Sales' rights to any of the Compositions have already been terminated will be addressed below.

## C. Validity of the Termination Notices

There are two additional issues that must be addressed: (1) whether Morris is precluded from exercising his termination right based on either *res judicata* or collateral estoppel resulting from his accession to the 1993 Settlement Agreement; and (2) if the Notices provided to Tempo and to Music Sales are effective.

### 1. Res Judicata and Collateral Estoppel

Plaintiffs assert that *res judicata* and/or collateral estoppel bar Morris and the Heirs from raising the following defenses: (1) that the 1962 Agreement and 1965 Amendment are not valid due to the passage of the rights from Strayhorn to Morris upon Strayhorn's death; and (2) that the 1962 Agreement and 1965 Amendment are terminable as a matter of law were it to be determined that the Siblings, and not Morris, inherited the rights. Plaintiffs assert that *res judicata* and/or estoppel bar these defenses as a result of Defendants' accession under the 1993 Settlement Agreement, which dismissed with prejudice all claims in the 1989 Litigation—the

---

**21.** The devolution of the rights from the executor is more complicated in cases where there

are both next of kin and legatees. However, in the instant case, there are no legatees.

litigation in which Morris and the Heirs sought rescission of these Agreements based on Tempo's nonperformance.

■ Plaintiffs' argument is not persuasive. *Res judicata,* also known as claim preclusion, is not appropriate (and not preclusive) here because what Plaintiffs seek to preclude are issues, not claims. Furthermore, the claims, or causes of action, in this dispute are different from those raised in the 1989 Litigation; thus, even were Plaintiffs seeking to preclude claims and not issues, *res judicata* would not be available due to the different claims in each litigation.[22] *See Blonder–Tongue Labs., Inc. v. University of Ill. Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *see generally* Restatement (Second) of Judgments §§ 17–19 (1982).

■ Collateral estoppel is also not appropriate. Estoppel applies only to issues that have been actually litigated; it does not apply either to issues that were determined without litigation (such as under a settlement agreement) or to those that could have been litigated but were not. *See Schiro v. Farley,* 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). While a court-approved settlement agreement, such as the 1993 Settlement Agreement, will suffice for purposes of *res judicata,* it will not satisfy the requirements of collateral estoppel. *See* 18 *Moore's Federal Practice* § 132.03[2][a] (3d ed.1999). This Court expressly held, in another music publishing case, that a court-approved settlement agreement does not fulfill the requirement of actual litigation for purposes of collateral estoppel. *See Jerry Vogel Music Co. v. Edward B. Marks Music Corp.,* 82 Civ. 6511, 1985 WL 3392, *7

(S.D.N.Y. Oct.23, 1985) ("[C]ollateral estoppel may not be invoked unless an issue has been actually litigated and decided .... [T]he settlement agreement reveals no binding admissions by either party regarding the issues between them, such that the issue of rights in the song could be said to have been decided").[23] Our Court of Appeals has held that arbitration of an issue did not meet the "actually litigated" requirement for the purposes of collateral estoppel. *See Khandhar v. Elfenbein,* 943 F.2d 244, 248 (2d Cir.1991). Accordingly, Plaintiffs cannot raise issue preclusion as a bar based upon the 1993 Settlement Agreement because it does not satisfy the "actually litigated" requirement.

The doctrine of collateral estoppel does not preclude Defendants from raising issues in the instant dispute that they may have raised but did not raise in the prior litigation. As this Circuit recently reaffirmed, "[c]ollateral estoppel does not prevent a litigant from raising, in a later proceeding, an issue that he could have, but did not, raise in the first proceeding .... [p]reclusion based on collateral estoppel grounds does not lie unless the issue was actually litigated." *See Leather v. Eyck,* 180 F.3d 420, 425 (2d Cir.1999).

Finally, the issues raised in this dispute and in the 1989 Litigation are different and are governed by different principles of law. This difference violates the estoppel requirement that the issues be identical in fact *and* law. *See Leather,* 180 F.3d 420, 425. In the first action, Morris and the Strayhorn Estate, then plaintiffs, sought,

---

**22.** In the 1989 Litigation, the Siblings and Morris sought the rescission of the Agreements with Tempo based on nonperformance, fundamentally a contract claim. In this dispute, Music Sales and Tempo seek a declaration under the Copyright Act that neither Morris nor the Siblings may terminate Tempo's or Music Sales' rights to the Strayhorn Compositions.

**23.** This decision leaves open the possibility that a court-approved settlement agreement

that does contain admissions by the parties could suffice for collateral estoppel purposes. However, the extensive 1993 Settlement Agreement between the Strayhorn Estate, Tempo, and Music Sales contains no such admissions. It is worth noting that the determinative factor here is whether the content of the settlement agreement is sufficient to satisfy the "actually litigated" requirement, not whether the claims determined by the settlement agreement were dismissed with prejudice.

*inter alia,* the rescission of the 1962 Agreement and 1965 Amendment based upon Tempo's nonperformance. *See* Complaint in 1989 Litigation, *passim,* Exh. D to Crosby Aff. They did not raise the terminability or invalidity of those contracts under copyright law, the issues raised in this dispute. *See id.* These different issues are governed by entirely different law. Issues are not identical where the statutes, legal principles, or legal standards governing them differ—even when the different issues rest on the same facts. *See id.; see also Metromedia Co. v. Fugazy,* 983 F.2d 350, 356 (2d Cir.1992).

## 2. Did the Termination Notices Conform to the Statutory Requirements?

### a. Requirements for Effective Termination Notices

 In order to determine if any or all of the Termination Notices are effective, it is necessary to review the requirements for effective notice set forth in the Register of Copyrights. *See* 37 C.F.R. § 201.10(c)(3); *see also* § 304(c)(3),(4) (setting forth that the requirements established by the Register of Copyrights shall be binding). In brief, the party seeking to terminate must serve notice on the grantee or grantee's successor in title no earlier than ten years prior to the first possible termination date and no later than two years prior to that date. The notice must also clearly identify the grant the notice purports to terminate and must list all the works in which the grantee's rights are to be terminated. *See* 37 C.F.R. § 201.10(c)(3).

### b. Did the 1993 Notice Conform to These Requirements?

The 1993 Termination Notice complied on its face with some of these requirements; other aspects of the Notice comply but require some discussion. As discussed *supra* Part VI.A.1., Morris was the proper

party to file the Notice. It was also appropriate that he alone filed the Notice, as he was the sole party to effectively assign the rights to Tempo under the 1969 Ellington Agreement. As the Siblings did not hold title to the rights at the time they signed the 1969 Ellington Agreement, their signatures on that Agreement were surplusage and do not create a requirement that they sign any notice terminating that Agreement.

### i. Language of the 1993 Notice was Sufficient

 Plaintiffs' contention that the language of the 1993 Notice was insufficient on its face is not correct.[24] The Notice "must include" a "brief statement reasonably identifying the grant to which the notice of termination applies." 37 C.F.R. § 201.10 at (b)(1)(iii). This statement must be "clear," "complete and unambiguous." *Id.* at § 201.10(b)(1) & (2). The form on which Defendants executed the Notice provides a space for the executing party to include "[a] brief statement reasonably identifying the Grant to which the Notice of Termination applies." 1993 Termination Notice, Exh. E to Morris Aff. The 1993 Termination Notice described the grant as the "Grant or transfer of copyright and the rights of copyright proprietor, including publication and recording rights." *Id.* Although this generic statement would not seem to reasonably identify the grant, the custom of the industry and of the Register of Copyrights dictates that this language is adequate. In fact, it appears to be boilerplate on termination notices customarily accepted by the Register of Copyrights. *See United States v. Haggar Apparel Co.,* 526 U.S. 380, ——, 119 S.Ct. 1392, 1394, 143 L.Ed.2d 480 (1999) (stating that agencies are able to interpret the requirements of a statute as long as such interpretations are consistent with the design and intent revealed by the legislature).

---

**24.** Plaintiffs' additional contention that the 1993 Notice is invalid because Morris had an agent execute it on his behalf is also incorrect. The Register of Copyrights' regulations state a termination notice may be executed by a "duly authorized agent" of the party holding the termination right. *See* 37 C.F.R. § 201.10(c)(3).

### ii. The 1993 Notice Provided Adequate Notice to the Relevant Party

Plaintiffs argue that even if the 1993 Notice is sufficient in its form and content, it is still ineffective because it did not meet the notice requirements for terminations. In response, Defendants assert that they provided sufficient notice of the 1993 Termination. They assert that only Tempo required notice, as only Tempo held the rights in the Compositions at that time, and that they notified Tempo of the 1993 Termination Notice in a timely fashion. Defendants also argue that, even though Music Sales was not entitled to formal notice, they apprised Music Sales of the filing of the Termination Notice during the relevant time period. Plaintiffs acknowledge that Tempo received notice but assert that Music Sales also required formal notice. Without such notice, they claim, the 1993 Termination Notice is invalid. They further claim that Music Sales was not apprised of nor was aware of the Termination Notice until 1996, at which time it objected to the Termination Notice.[25] *See* Compl. ¶ 63; Edwards Aff. ¶ 7.

■■■■ This discrepancy between the parties, though factual, does not preclude summary judgment because it is not material to the outcome of the dispute. At the time of the 1993 Termination Notice, Music Sales did not hold any rights in any of the Compositions included in that Termination Notice. Therefore, they were not entitled to notice, and the only issue that is material to the validity of the 1993 Termi-

nation Notice is whether Tempo had adequate notice of the termination.

Tempo received appropriate and timely notice of the termination. *See* Amended complaint ¶ 63. Because the 1993 Termination Notice is otherwise technically sufficient, this Notice terminated Tempo's rights in the Compositions listed in the 1993 Termination Notice.

The fact that Morris had no statutory obligation to notify Music Sales of the 1993 Termination Notice does not mean that Music Sales had no legitimate business interest in knowing of the Termination Notice. Under the Settlement Agreement, Music Sales was, in effect, purchasing the rights to the Compositions from Tempo by paying off Tempo's debt to the Strayhorn Estate. Therefore, Music Sales had a material interest in knowing of the conditions subject to which they were purchasing their interest in the Compositions.[26] Nonetheless, the legitimacy of Music Sales' interest in knowing of the Termination Notice does not translate into a duty on the part of Morris and the Strayhorn Estate to provide notice to Music Sales. Any claim that Morris failed to notify Music Sales is misdirected; it was Tempo that should have disclosed the filing and impact of the 1993 Termination Notice to Music Sales because the Settlement Agreement pursuant to which Music Sales acquired its rights in the Compositions was executed by Music Sales and Tempo.[27]

### c. 1998 and 1999 Notices Filed by Morris are Sufficient

The notices filed by Morris in 1998 and 1999 meet the requirements of § 304 and

---

**25.** Plaintiffs assert that "[w]ith respect to the 1993 Notice, Defendants did not even purport to serve that notice upon Music Sales, as it [Music Sales] did not acquire its rights in the Strayhorn Compositions until after that notice [the 1993 Notice] was served." Pls. Memo., p. 19, n. 22. Barrie Edwards, President of Music Sales, also asserts in his affidavit that he was not aware of the 1993 Notice. *See* Edwards Aff. ¶ 7. Defendants submit a letter, dated August 3, 1993, from their then-counsel to Edwards and his counsel informing them of the 1993 Termination Notice filed by Morris, the works included in that Notice, and the

impact of this Notice on the litigation then in progress. *See* August 1993 Letter, Exh. A to Morris Decl.

**26.** Music Sales contends that its substitution as debtor to the Strayhorn Estate in place of Tempo constitutes a novation. The parties have reserved their arguments on novation.

**27.** There is no documentary evidence presented by Plaintiffs or Defendants that Tempo gave Music Sales notice of the 1993 Termination Notice, nor do the parties address that issue.

of the Register of Copyrights in all particulars. The termination notices filed by Dicks, however, are not valid, since she is not the proper party to file terminations. Morris is the proper party to file; he is entitled to exercise his termination right over any Compositions included in the 1998 and 1999 Notices that were not included in and terminated under the 1993 Termination Notice.[28] It is evident that Tempo and Music Sales received adequate notice of the 1998 and 1999 Termination Notices because their receipt of these Notices caused them to institute the instant litigation. In terms of form and language, these Notices meet the requirements elaborated in the discussion of the 1993 Termination Notice, containing the boilerplate designation of the grant to be terminated and a complete listing of the Compositions, their author, date of copyright, and effective termination date. *See* Amended complaint, Exhs. E–P, 1998 and 1999 Termination Notices; Morris Aff. Exhs. F, G.

■ However, only the works specified in a termination notice are terminated, even where the notice purports to terminate a grant including more works than actually listed in the notice. *See Burroughs v. Metro–Goldwyn–Mayer, Inc.,* 683 F.2d 610 (2d Cir.1982).[29] I therefore conclude that Plaintiffs' rights in any of the Compositions listed in the 1998 and 1999 Termination Notices executed by Morris (but not Dicks), and not appearing in the 1993 Termination Notice, have been terminated.

**28.** However, he may not successfully terminate again any Composition included in and terminated under the 1993 Termination Notice. *See* discussion of the termination right as a single-use instrument, *supra* Part V.C.1.

**29.** The sole case to discuss the sufficiency of a termination notice is *Burroughs v. Metro–Goldwyn–Mayer, Inc.,* 683 F.2d 610 (2d Cir. 1982), in which Metro–Goldwyn–Mayer (MGM) contested the sufficiency of the notice served upon it purporting to terminate its rights in the character Tarzan. The notice in

## D. Impact of the 1993 Termination Notice on Music Sales' Rights in the Compositions

The determination that Morris is legally able to terminate assignments he has made of the Compositions, and that the Termination Notices are sufficient and effective as discussed above, does not dispose of the question of what rights the various parties currently hold in the Compositions included in the 1993 Termination Notice. The 1998 and 1999 Termination Notices are straightforward in their effect: they terminate Music Sales' and Tempo's rights in the Compositions listed therein that were not also included in the 1993 Termination Notice. However, some of the most valuable Compositions were those included in the 1993 Termination Notice. The effect of this Notice is still an open issue.

It is unclear from the current submissions whether the Settlement Agreement, which conveyed Tempo's interest in the Compositions to Music Sales, constituted a transfer of interest, a transfer of title, an express or implicit reassignment of the copyrights by Morris, or a novation. These different possibilities, not yet addressed by the parties, lead to different outcomes. Because the termination right may only be exercised once relative to any copyright, a termination of Tempo's rights and a subsequent reassignment to Music Sales would give Music Sales the non-terminable rights to the Compositions covered in the 1993 Termination Notice. However, if Morris and the Strayhorn Estate's consent to the Settlement Agree-

that case listed all but five of the copyrights assigned to MGM. The Court of Appeals held that the notice was sufficient and effective for the works listed but that it did not terminate MGM's rights to the five works that were omitted from the Notice, despite the fact that all of the works were conveyed to MGM under the same agreement or "grant." Thus, despite the specific identification of the grant to be terminated, only works actually listed in a termination notice will be terminated by that notice.

ment was not a reassignment, then Music Sales may have succeeded to Tempo's rights subject to the termination that Morris had filed. In other words, Music Sales would have purchased only rights enduring from the time of the execution of the Settlement Agreement to the time of the effective date of the termination for each Composition. The ultimate determination of the effect of the 1993 Termination Notice on the rights that the various parties currently hold will therefore be reserved until these issues are more fully developed.

### E. Admissibility of the Patry Affidavit

Defendants have submitted an affidavit by Professor William F. Patry ("Patry") on the subject of the correct interpretation of the 1976 Act. *See* 3/19/99 Affidavit of William F. Patry ("Patry Affidavit" or "Patry Aff."). Patry is a professor of copyright law and former copyright counsel to the House Subcommittee on Intellectual Property. *See* Patry Aff. ¶ 6. Plaintiffs contest the admissibility of this affidavit on the grounds that it impermissibly expresses conclusions on matters of domestic law. Plaintiffs are correct.

 This Court has repeatedly held that the testimony of an expert on matters of domestic law is inadmissable for any purpose. *See Hygh v. Jacobs,* 961 F.2d 359, 363 (2d Cir.1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion . . . ."); *see also Motown Prods., Inc. v. Cacomm, Inc.,* 668 F.Supp. 285, 288 (S.D.N.Y.1987), *rev'd on other grounds,* 849 F.2d 781 (2d Cir.1988) (holding inadmissible an affidavit by an expert in copyright law opining that a term was suggestive rather than descriptive on the grounds that such an opinion was a conclusion of law). Although it has sometimes been asserted that the basis for excluding expert testimony on domestic law is that it might unduly sway a jury, *see* VII *Wigmore on Evidence* § 1949, at 66 (3d ed.1940), such testimony is inadmissible whether offered at trial for the benefit of the jury or submitted with motions for the

benefit of the judge. *See Ideal World Marketing, Inc. v. Duracell, Inc.,* 15 F.Supp.2d 239, 244 (E.D.N.Y.1998) (disallowing an expert report offered with a motion for summary judgment, stating that "this proposed 'expert' report, which offers a legal conclusion based upon the undisputed facts before the Court, impinges upon the Court's role . . . ."). Patry's affidavit is not inadmissible merely because he is a professor of and expert in an area of domestic law. The testimony of a legal expert is admissible as to the ordinary practices of those engaged in the business of law, legal studies, or law-related fields, or as to trade customs and usages of those so employed. *See Marx & Co. v. The Diners' Club, Inc.,* 550 F.2d 505, 509 (2d Cir.1977) (excluding the testimony of a securities lawyer in which the lawyer expressed opinions on and conclusions of domestic law; holding that the lawyer's testimony would be admissible on the same basis as the testimony of other professionals, such as doctors, i.e., concerning the ordinary practice or trade customs of like professionals). However, Patry's affidavit almost wholly expresses legal conclusions on the meaning of the 1976 Act (except for some brief historical background on the Act). *See* Patry Aff., *passim.* For these reasons, the Affidavit is stricken.

### VIII. Conclusion

For the foregoing reasons, it is declared in Defendants' favor that: (1) the assignments of the copyrights made by Morris as Executor are terminable by Morris; (2) the 1998 and 1999 Termination Notices filed by Morris terminate Music Sales and Tempo's rights in the Compositions that are included exclusively therein but not also included in the 1993 Termination Notice; and (3) the 1993 Termination Notice terminates Tempo's rights in the Compositions included therein.

It remains to be determined what effect the 1993 Termination Notice has on the rights held by Music Sales to the Compositions included in that Notice. The disposi-

tion of the rights in the Compositions included in the 1993 Termination Notice will be determined upon parties' submission of further materials.

On the additional matter of the Patry affidavit, judgment is granted in Plaintiffs' favor and the affidavit is stricken.

As determination of this Motion for Summary Judgment does not dispose of this case, consideration of whether to award attorneys' fees, as requested in Defendants' Motion for Summary Judgment, is premature.

A conference is scheduled for August 31 at 11:00 a.m.

SO ORDERED: