Jack ROBINSON, et al., Appellants,

v.

Joseph L. SARISKY, Appellee.

No. 86–258.

District of Columbia Court of Appeals.

Argued Nov. 5, 1987.
Decided Jan. 7, 1988.

property pursuant to a valid tax deed. After a trial before Judge Salzman, the jury awarded Sarisky $4,000 in compensatory damages. The jury could not agree on punitive damages, however, so appellants moved for a mistrial, which Judge Salzman granted only in part. He ordered that a new trial be held on Sarisky's claim for punitive damages, but he refused to order a new trial on the issue of liability or on Sarisky's claim for compensatory damages. At the second trial before Judge Fauntleroy, the jury awarded Sarisky $250,000 in punitive damages.

Appellants raise three issues on appeal. First, they argue that Sarisky did not present sufficient evidence to support the first jury's award of $4,000 in compensatory damages. Second, they challenge the second jury's award of $250,000 in punitive damages as excessive, particularly in comparison with the compensatory damages awarded by the first jury. Finally, appellants claim that the trial court abused its discretion by ordering a new trial on only the punitive damages issue. We affirm the trial court's judgment in all respects.

Margaret A. Beller, Washington, D.C., for appellants.

John J. Brennan, III, with whom Richard M. Tarby, Washington, D.C., was on the brief, for appellee.

Before PRYOR, Chief Judge, and NEWMAN and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellee Sarisky brought this action for wrongful eviction against appellants Jack Robinson, Thomas Robinson, and William Robinson. Sarisky alleged that appellants, over a three-week period in April and May 1981, had locked him out of his home four times and had waged a campaign of malicious harassment to force him to move out. Appellants answered that they did not know the building was occupied and that they had properly taken possession of the

I

On April 15, 1981, the District of Columbia conveyed to appellants by deed a two-story building at 2114 N Street, N.W., after appellants had purchased the property at a tax sale. The tax deed, however, had been issued in error, for in fact no taxes on the property were in arrears.

Joseph Sarisky testified at trial that he was the record owner and occupant of the building at 2114 N Street, N.W. On the evening of April 20, 1981, upon returning from a trip to Pennsylvania, he found that his home had been broken into and that his deadbolt lock had been removed and replaced with a hasp and padlock. Sarisky immediately called the telephone number on the crudely lettered "No Trespassing" sign which had been placed on the door, leaving a message that he wished to speak the next morning to whoever had locked him out. He then removed the new lock and spent a fitful night in his home.

The following morning, April 21, Sarisky spoke to William Robinson by telephone, telling Robinson that he was living in the building, that he owned it, and that he wished to meet with Robinson to prove he was the owner. Sarisky testified that his statements were met with hostility, and that Robinson repeatedly denied that Sarisky lived in or owned the building. When Sarisky offered to meet Robinson at the N Street address and show him that the building was occupied, "[Robinson] said, 'The building is vacant,' and slammed the phone down." Later that day Sarisky replaced the lock which he had found on the door the previous evening with a new lock that he bought at a hardware store.

Upon his return home from work that same evening, Sarisky found that yet another lock had been installed. In addition, a notice to quit the premises within thirty days, addressed to him by name as "Occupant" of 2114 N Street, N.W., was posted on the door. Sarisky again removed the lock and replaced it with one of his own.

On April 26 Sarisky came home to find that he had been locked out a third time. On this occasion the door and the frame had been damaged by the removal of Sarisky's padlock, and a new lock had been installed. Several "For Sale" signs had been nailed into the aluminum siding on the second story of the building, and another "No Trespassing" sign had been posted on the front door. Sarisky removed the lock and the signs.

On May 4 Sarisky returned from a weekend trip to discover that someone had again nailed "For Sale" signs into the aluminum siding. This time, however, the front door had also been nailed shut around the entire door frame, and a hand-lettered cardboard sign saying "No Trespassing / Property Checked / 24 Hours a Day / Monarch Security / 452–5533" had been nailed to the door. Fearing that appellants might return and try to oust him forcibly at any time, Sarisky moved out of the building and sought legal help.

A few weeks later Sarisky filed suit against appellants and the District of Co-

lumbia, seeking cancellation of the tax deed, an injunction against any interference by appellants with his use of the property, damages for appellants' allegedly tortious conduct, and other relief. Along with his complaint Sarisky filed a motion for a temporary restraining order to keep appellants from exercising dominion over his building; that motion was promptly granted. In the course of the litigation, the District of Columbia admitted that the tax deed had been wrongfully issued, and the court declared it null and void and ordered it canceled. At that point the District of Columbia dropped out of the case.[1]

The case then went to trial on Sarisky's claims against the Robinsons for wrongful eviction and intentional infliction of emotional distress. Sarisky asserted that he had been the victim of an intentional, malicious campaign to force him from his home and that he was therefore entitled to compensatory damages for repairs to the house, personal items which he had been obliged to replace, and mental suffering. He also sought punitive damages. He presented evidence that he had lived at 2114 N Street, N.W., since 1976, that he was in the process of renovating the building so that the first floor could be used as a restaurant and the second floor as an apartment, and that it was zoned for both residental and commercial uses. Sarisky further testified that he kept his personal belongings there, including a bed, other furniture, clothing, dishes, silverware, an air conditioner, and a heater, all plainly visible on any inspection. Photographs were introduced to corroborate Sarisky's testimony.

Appellants had originally asserted that they did not know anyone was occupying the building, that it was zoned only for commercial use, and that all their acts were done lawfully, pursuant to a valid tax deed. At trial, however, they admitted that they had acted as they did in order to force Sarisky to sue them. Sarisky would then have had the burden of proving that he had a valid title to the property, and the Corpo-

1. The District of Columbia is not a party to this appeal.

ration Counsel would have had to defend the suit on behalf of the District of Columbia.

Concerning their own actions, appellants testified[2] that after obtaining the tax deed, they visited the property on April 20 to inspect it. They gained entry through the front door, which they said was open. With the aid of a flashlight, they inspected both floors of the building but saw no signs of habitation. Inside the building they found two motorcycles with expired license plates and flat tires sitting in a large puddle of water, several acoustic ceiling tiles that had fallen to the floor, dirt, sheet rock, and a badly leaking roof. They did locate an office with a few pieces of furniture in it, but concluded that it had not been used for some time. Assuming that they had purchased an abandoned warehouse,[3] they removed the lock from the front door and replaced it with another. They nailed a sign on the door stating that the building was for sale and giving a telephone number at which inquiries could be made. That evening they received a call from Joseph Sarisky, the record owner of the property prior to the tax sale. Jack or Thomas Robinson answered the phone and took his number, and the next morning William Robinson called him back. William Robinson denied telling Sarisky that the building was vacant, saying, "We did not get into that."

## II

Appellants claim that Sarisky offered no proof of medical expenses or of relocation, repair, or replacement costs so that the jury could not have set a reasonable amount of compensatory damages. They also maintain that Sarisky offered no proof of the value of the items he bought to replace those which were allegedly damaged or destroyed. Further, appellants assert that the award of $4,000 was excessive because Sarisky was limited by his pre-trial statement to $2,225. Finally, appellants argue that Sarisky failed to prove that they engaged in the type of conduct which would support an award of damages for emotional distress. We find none of these arguments to be persuasive.

In the first place, the law presumes that some damages result from an unlawful eviction. *Higgins v. Dail*, 61 A.2d 38, 40 (D.C.1948); *see Northeast Auto Wreckers, Inc. v. Sanford*, 43 A.2d 292, 293 (D.C.1945). Such damages are not limited to physical injury or property loss. This court long ago accepted the principle "that a tenant who has been unlawfully evicted may recover for mental suffering, inconvenience and discomfort." *Higgins v. Dail, supra*, 61 A.2d at 40 n. 2 (citations omitted). In this case, moreover, the wrongful eviction claim was joined with a separate claim for intentional infliction of emotional distress based on essentially the same facts. We have often held that an award of compensatory damages "should be set aside only when [the jury's verdict] indicates prejudice, passion, or partiality, or when it must have been based on oversight, mistake, or consideration of an improper element." *Spar v. Obwoya*, 369 A.2d 173, 180 (D.C.1977) (citation omitted); *accord, e.g., Boynton v. Lopez*, 473 A.2d 375, 377 (D.C.1984). Having reviewed the extensive record in this case, we are satisfied that Sarisky presented sufficient evidence on which the jury could reasonably base its award of $4,000 in compensatory damages.

The only physical damages and out-of-pocket expenditures that Sarisky proved were his costs of repairing and replacing the locks and doors that were damaged by appellants' activities, together with the cost of various articles of clothing and toiletries

2. Each appellant testified as to particular facts within his personal knowledge. All of them said, however, that each knew what the others were doing and that they all acted as partners. For the purposes of this opinion, therefore, we shall treat the testimony of any of the three appellants as applicable to all of them.

3. Sarisky had previously testified that before he bought the building in 1973 it had been used as a warehouse. After he bought it, however, he did a substantial amount of remodeling, which included removing the garage-type doors, closing up that doorway with cinder blocks, and installing a new doorway.

which he had to buy after the door to his home was nailed shut. The major portion of the damage award was plainly for the mental anguish which Sarisky allegedly suffered as a result of appellants' continued harassment. Both Sarisky and his wife[4] testified to his distress over the lockout. Mr. Sarisky described the feelings of violation, anxiety, and helplessness which disrupted his activities and disturbed his sleep over a period of several weeks. Mrs. Sarisky recounted how her husband's personality had changed for the worse and how he drank more than she had ever noticed before.

■ This evidence, in our view, was more than sufficient to support the jury's verdict. Sarisky's actual out-of-pocket expenditures were relatively low, but the jury also had before it Sarisky's claim for intentional infliction of mental distress.[5] There was ample evidence to show that appellants intentionally or recklessly engaged in "extreme and outrageous conduct" which resulted in "severe emotional distress" to Mr. Sarisky. RESTATEMENT (SECOND) OF TORTS § 46 (1965), cited with approval in *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982), and *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C.1980). In his amended complaint Sarisky had asked for $100,000 in compensatory damages; the jury's modest award of $4,000 surely cannot be said to have result-

ed from improper passion or prejudice. We find no basis for overturning that award.[6]

## III

Appellants contend that their actions against Sarisky were not malicious and that the court therefore erred in allowing the jury to award punitive damages. They also assert that the amount awarded, $250,000, so far exceeded the compensatory damages as to be improper as a matter of law. There is no merit in either of these arguments.

■ Punitive damages are available in actions for intentional torts such as wrongful eviction. *Mendes v. Johnson*, 389 A.2d 781, 792 (D.C.1978) (en banc); *see Camalier & Buckley–Madison, Inc. v. Madison Hotel, Inc.*, 168 U.S.App.D.C. 149, 162 n. 93, 513 F.2d 407, 420 n. 93 (1975). In general, punitive damages may be awarded for tortious acts "aggravated by 'evil motive, actual malice, deliberate violence or oppression,'" *Price v. Griffin*, 359 A.2d 582, 589 (D.C.1976) (citation omitted), or for "outrageous conduct ... in willful disregard for another's rights." *Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.*, 492 A.2d 580, 593 (D.C.1985) (citations omitted). The requisite state of mind need not (and usually cannot) be proven by direct evidence, but may be inferred from all the facts and circumstances of the case. *Id.* at 593; *Bay General Industries, Inc. v. Johnson*, 418 A.2d 1050, 1058 (D.C. 1980).

---

**4.** Although the Sariskys were not married until 1984, they had known each other for several years before that and were engaged at the time of the events at issue in April and May 1981. Mrs. Sarisky testified that the only place her husband had lived before their marriage, since she had first known him, was the building at 2114 N Street, N.W. She was also aware that he was renovating the building.

**5.** Appellants' reliance on *Town Center Management Corp. v. Chavez*, 373 A.2d 238 (D.C.1977), is misplaced. In that case we reversed an award of compensatory damages for mental suffering greater than the amount claimed in the pre-trial order because the defendant "was denied the opportunity to litigate this item...." *Id.* at 245. Here, however, the issue was fully litigated. Sarisky presented substantial evidence to support his claim, and the trial court

instructed the jury, without objection, that it could award damages "to the extent that you find he has suffered any of these consequences" —property damage, out-of-pocket expenses, *and* mental distress—"as a result of the wrongful eviction."

**6.** Appellants' contention that Sarisky was limited by his pre-trial statement to $2,225 in compensatory damages is not supported by the record. The pre-trial statement makes clear that the $2,225 figure relates only to "repairs or replacement of the damaged door and frame, damaged aluminum siding and the cost of locks...." It goes on to specify other items for which Sarisky sought *additional* damages, including "the inconvenience, discomfort, humiliation and distress which the defendants inflicted."

Once the necessary malice is established, the amount of punitive damages is left to the jury's discretion. *Town Center Management Corp. v. Chavez, supra* note 5, 373 A.2d at 245; *Franklin Investment Co. v. Homburg,* 252 A.2d 95, 98 (D.C.1969); *Afro-American Publishing Co. v. Jaffe,* 125 U.S.App.D.C. 70, 83, 366 F.2d 649, 662 (1966) (en banc). Deterrence and punishment are "the basic purposes" of punitive damages which the jury may consider in computing the amount to be awarded. *Id.* at 84, 366 F.2d at 663. The jury may also take into account certain other factors, including the duration and cost of the litigation and the relative wealth of the defendant. *See Town Center Management Corp. v. Chavez, supra* note 5, 373 A.2d at 246 (citing cases); *Smith v. District of Columbia,* 336 A.2d 831, 832 (D.C.1975), quoting from *Fisher v. City of Miami,* 172 So.2d 455, 457 (Fla.1965) ("the wealthier the wrongdoer, the greater the award").

Applying these general principles, we find no error in either the fact that the jury awarded punitive damages or the amount of those damages. The jury could reasonably find that appellants acted with malicious intent and in willful disregard of Mr. Sarisky's rights in the N Street property. Viewed in the light most favorable to appellee Sarisky,[7] the evidence showed that appellants deliberately refrained from taking legal action, choosing instead to wage a purposeful campaign of harassment to force Sarisky from his home and cause him to sue first. The jury was entitled to discredit, as it evidently did, appellants' claims that they did not know the building was inhabited, especially when Sarisky provided strong evidence of his continued habitation. *See Town Center Management Corp. v. Chavez, supra* note 5, 373 A.2d at 245 (punitive damages allowed when landlord locked out tenant for non-payment of rent, even though landlord knew the rent was fully paid and wanted to make an example of tenant to other complaining tenants);

*Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc., supra,* 168 U.S.App.D.C. at 162 n. 93, 513 F.2d at 420 n. 93 (punitive damages awarded on a finding that landlord locked out tenant by changing locks in the middle of the night, instead of invoking legal procedures, when landlord knew that tenant claimed a right to possession). That appellants may have believed they had a valid tax deed does not mitigate the malicious character of their actions. They cannot assert that they made an innocent mistake[8] when they knew that Sarisky claimed ownership of the building. Sarisky's initial call put them on notice that someone else lived in the building and claimed a right of ownership; moreover, appellants acknowledged this claim by addressing their notice to quit to Sarisky *by name* as the "Occupant" of 2114 N Street, N.W.

Nor do we find any basis for reversal in the amount of the award. Appellants maintain that the second jury's verdict awarding $250,000 in punitive damages is excessive when compared with the $4,000 in compensatory damages given by the first jury. It is well established, however, that punitive damage amounts need not bear any relation to compensatory damages. "Punitive damages depend not upon the amount of actual damage, but upon the intent with which the wrong was done." *Washington Post Co. v. O'Donnell,* 43 App.D.C. 215, 240, *cert. denied,* 238 U.S. 625, 35 S.Ct. 663, 59 L.Ed. 1495 (1915); *accord, Afro-American Publishing Co. v. Jaffe, supra,* 125 U.S.App.D.C. at 83, 366 F.2d at 662; *Wardman-Justice Motors, Inc. v. Petrie,* 59 App.D.C. 262, 266, 39 F.2d 512, 516 (1930). Indeed, a plaintiff need not prove anything more than nominal actual damages to justify the imposition of punitive damages. *United Securities Corp. v. Franklin,* 180 A.2d 505, 511 (D.C. 1962); *American Home Life Insurance Co. v. Cerrone,* 43 App.D.C. 508, 512 (1915); *Washington Post Co. v. O'Donnell, supra,* 43 App.D.C. at 240. Furthermore,

---

7. *See, e.g., Penn Central Transportation Co. v. Reddick,* 398 A.2d 27, 32 (D.C.1979); *Shewmaker v. Capital Transit Co.,* 79 U.S.App.D.C. 102, 103, 143 F.2d 142, 143 (1944).

8. *See Mendes v. Johnson, supra,* 389 A.2d at 793.

an award of punitive damages may not be reduced unless it is "grossly excessive." *Franklin Investment Co. v. Homburg, supra,* 252 A.2d at 99; *General Motors Acceptance Corp. v. Froelich,* 106 U.S.App. D.C. 357, 360, 273 F.2d 92, 95 (1959). The punitive damages in this case cannot be so described. On the contrary, appellants should consider themselves fortunate that the jury awarded a mere $250,000, for the evidence would probably support a greater amount. On the present record, we conclude that the sum awarded was altogether reasonable.

### IV

▮ Appellants' final contention is that the trial court erred in denying their motion for a new trial on liability and compensatory damages. After the jury in the first trial reported that it could not agree on Sarisky's claim for punitive damages, the court declared a partial mistrial and ordered a new trial on punitive damages alone.[9] Appellants now maintain that the issues of liability and damages were so intertwined that the trial court's ruling denied them a fair trial on damages. We are not persuaded.

This court in several cases has considered challenges to trial court orders granting partial new trials or limiting new trials to certain issues. We summarized the applicable law most recently in *Weinberg v. Johnson,* 518 A.2d 985, 993 (D.C. 1986):

> The judge has discretion to grant or deny a new trial to prevent a miscarriage of justice, and a new trial does not require a retrial as to all the issues that were part of the first trial.... A limited new trial is appropriate, however, only where the issues in a case are separate and distinct and where certain of the issues have

been fairly tried and determined.... This court reviews the trial court's decision solely for an abuse of discretion. [Citations omitted.]

In this case we find no abuse of discretion, and hence no reversible error.

▮ Although in some cases the issues of liability and damages may be so interwoven that they cannot be fairly separated, *see Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *Munsey v. Safeway Stores, Inc.,* 65 A.2d 598, 601 (D.C.1949), that is not the situation here. There is no real uncertainty in the evidence on the issue of liability, and appellants have not shown how the second jury could have been confused or affected by the first jury's award of compensatory damages. The second jury made its own finding of malice on evidence presented to it at the second trial—essentially the same as that presented at the first trial. Appellants were not hindered in any way at the second trial in the presentation of their defense, nor were they surprised by any new evidence or new arguments. *See Bedell v. Inver Housing, Inc.,* 506 A.2d 202, 207 (D.C.1986). Appellants' assertion that the second jury would assume that it should assess some punitive damages simply because it was convened for that purpose is utter speculation, without any support in the record. It also ignores the court's instructions that punitive damages could be awarded only upon a finding of the requisite malice, instructions which we must presume the jury followed. *See, e.g., Smith v. United States,* 315 A.2d 163, 167 (D.C.), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). In short, we conclude that the issues, though connected, were not so closely intertwined that the order granting the partial new trial was unfair.[10]

---

**9.** Super.Ct.Civ.R. 59(a) authorizes the court to grant a new trial "to all or any of the parties and on all or part of the issues...."

**10.** Appellants raise two more issues which may be briefly treated.

First, they argue that Sarisky's legal fees were improperly included in the award of compensatory damages. The trial judge, however, expressly instructed the jurors that they were not

to consider attorney's fees in calculating the amount of compensatory damages, and we must presume that the jury understood and followed this instruction. *Smith v. United States, supra,* 315 A.2d at 167.

Second, appellants maintain that the testimony of Charles Fortney, Chief of Assessments and Taxation for the District of Columbia, concerning the value of the N Street property was in-

**V**

There being no reversible error, the judgment of the Superior Court is

*Affirmed.*

competent because Fortney admitted he did not know the value of a tax deed as distinguished from a fee simple deed. This argument misreads Mr. Fortney's testimony. He testified only that the District of Columbia does not distinguish between the two types of deeds when evaluating the market value of a piece of property "because we appraise property as if it

were free and clear of all incumbrances." As far as Mr. Fortney was concerned, the circumstances by which ownership might have been acquired were irrelevant to the fair market value of the property.