Rodney OWENS, Plaintiff,

v.

**NATIONAL MEDICAL CARE, INC. d/b/a Fresenius Medical Care North America and Biomedical Applications of Northeast D.C., Inc., Defendants.**

**Civ.A. No. 03–0251 RBW.**

United States District Court, District of Columbia.

Sept. 28, 2004.

Stephen Chertkof, Heller, Huron, Chertkof, Lerner, Simon & Salzman, PLLC, Washington, DC, for Plaintiff.

Jason Matthew Branciforte, Littler Mendelson, P.C., Washington, DC, for Defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

Plaintiff, Rodney Owens, brings this action alleging that he was discharged from his employment as a dialysis machine repair technician in violation of public policy after he "objected and refused to participate in the falsification of maintenance records." First Amended Complaint ("Compl.") ¶ 1. Currently before this Court are the Defendants' Motion for Summary Judgment ("Defs.' Mot.") and their Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' Mem."), the Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"), and the Defendants' Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Defs.' Reply"). For the following reasons the defendants' motion is denied.

### I. Background

The following facts are derived from the defendants' Separate Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (Defs.' Stmt.).[1] The defendants, National Medical Care, Inc., Fresenius Medical Care North America, and Biomedical Application of Northeast D.C., Inc., maintain and operate dialysis facilities "in and around the District of Columbia." Defs.'

---

1. The plaintiff submitted a statement of disputed material facts, thus, unless noted otherwise, the facts discussed in this section were not disputed in the plaintiff's filing.

Stmt. ¶ 1. In February 1996, the plaintiff commenced his employment as an Equipment Technician with the defendants at a dialysis facility in Camp Springs, Maryland. *Id.* ¶ 2. In this role, the plaintiff was responsible for, *inter alia,* repairing dialysis equipment. *Id.* ¶ 5. This included, identifying problems with the dialysis machines, performing the necessary repairs, and certifying that the dialysis machines were ready for patient use. *Id.* In the Summer of 2000, the plaintiff transferred to a dialysis facility in Northeast, Washington, D.C. ("Northeast facility"). *Id.* ¶ 3.

On November 14, 2001, the plaintiff returned to work following a three month leave of absence. *Id.* ¶ 15. Upon his return, the plaintiff was asked by his direct supervisor, Eugene Howard, Chief Technician for the Northeast facility, to repair dialysis machine numbered "24" ("machine # 24"). *Id.* ¶ 16. Sometime between November 14, 2001 and December 5, 2001, patients received treatment on machine # 24 after it was put back into service. On December 5, 2001, Robert Ward, Area Administrator, received notice that five patients who had received dialysis treatment at the Northeast facility had been sent to the hospital with elevated electrolyte levels after becoming ill. *Id.* ¶ 17. Following an investigation, Ward determined that each of the patients had received treatment on machine # 24. *Id.* ¶ 18. Ward removed machined # 24 from service and instructed Joseph Brawner, Regional Technical Manager, to investigate and inspect machine # 24 to determine why patients had become ill after receiving treatment on the machine. *Id.* ¶¶ 19, 20, 21. During the

investigation, Brawner discovered that the "conductivity readings" for the machine were out of range. *Id.* ¶ 22. Upon further inspection, Brawner discovered that the acid and bicarbonate fluid inlet lines within the machine were crossed and improperly connected.[2] *Id.* ¶ 23. Once the inlet lines were properly connected, machine # 24's conductivity range registered in the normal range. *Id.* ¶ 24. On December 6, 2001, Brawner issued a written report of his findings. *Id.* ¶ 28; Exhibits to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (" Pl.'s Ex.") 15 at 1–2. In the report, Brawner wrote:

> [a]fter completing my machine investigation[,] I asked the Equipment Technician (Rodney Owens) what repairs did he perform on the machine in question prior to placing it in service [and] he stated the following[:]
>
>> "Joe, I replaced the actuator board and the function board but that was not the problem so I put the original boards back and just replaced the actuator board ribbon cable that fixed the problem. I then calibrated the temperature and conductivity."
>
> I then asked him (Rodney) what was the original machine problem; he stated the following[:]
>
>> "I don't know[,] Eugene told me to fix the machine it has a conductivity problem."

Pl.'s Ex. 15 at 2. This report was forwarded to Ward and the Regional Manager, Jennifer Nazarko. Defs.' Stmt. ¶ 30. On December 7, 2001, the plaintiff's employment with the defendants was terminated.

---

**2.** A dialysis machine, such as the one in question here, operates by passing a patient's contaminated blood across a membrane over which a dialysate solution is also separately passed. Through the process of osmosis, the contaminants in the patient's blood travel through the membrane and into the dialysate

solution. This solutions is created by a mixture of acid and bicarbonated fluids that are pumped into the machine at specified quantities. Defs.' Mem. at 5 n. 3 (citing to portions of Dr. Javed Rahmat deposition transcript contained in Pl.'s Ex. 43).

*Id.* ¶ 37; Pls.' Opp'n at 15. Based upon the parties pleadings, the facts set forth above are the only material facts not in dispute.

According to the defendants, Ward and Nazarko met to discuss Brawer's report. *Id.* ¶¶ 32, 34. At this meeting, Ward and Nazarko decided that the plaintiff should be discharged because he had improperly repaired machine # 24 and could have endangered patient safety. *Id.* ¶ 33. The defendants assert that no one else participated in the discussions to terminate the plaintiff and that the decision was based solely on the contents of Brawer's report. *Id.* ¶¶ 34, 36. However, the plaintiff contends that not only were Ward and Nazarko present for the discussion which led to his termination, but also in attendance were Dr. Javed Rahmat, the Medical Director, Helen Grace Tagunicar, the Director of Nursing, and possibly Howard, the plaintiff's direct supervisor. Pl.'s Opp'n at 14.

The plaintiff suggests that his termination was not based on his alleged improper repair of machine # 24, but rather his refusal to falsify dialysis machine records. Pl.'s Opp'n at 1. Thus, the plaintiff alleges that the defendants' assertion that he was terminated because he improperly repaired machine # 24 was a pretext for the true reason for his termination—refusal to falsify the records of machine # 24. *Id.*

According to the plaintiff, he began repairing machine # 24 by reassembling the machine to determine why it was not working properly. *Id.* at 6–7. While waiting for the machine to warm-up, the plaintiff reviewed machine # 24's logbook, which lists all of the work that has been performed on that machine. For each entry in the logbook, the technician who is working on the machine is required to write down the number of hours listed on the hours meter, *i.e.*, the number of hours

a dialysis machine has been used, and the work that had been performed on the machine previously. *Id.* at 7. While reviewing the logbook, the plaintiff stated that he found a discrepancy between the number of hours on the machine's internal hours meter and the number of hours listed in the logbook. *Id.* According to the plaintiff, the logbook indicated that machine # 24 had operated for over 6,000 hours, while the machine's internal meter showed only 1,800 hours of operation. *Id.* Because the plaintiff's supervisor (Howard), was not at the facility at the time he discovered the discrepancy, the plaintiff states that he stopped working on the machine and placed a "do not use" sign on it. *Id.* When the plaintiff finally spoke to Howard about the problem, Howard allegedly told him to just "forge the hours as [he] went along" so that the entries in the maintenance record would correspond with the prior entries. *Id.* at 8. The plaintiff states that he informed Howard that he would not forge the hours in the logbook and thus would not continue to repair the machine. *Id.* The plaintiff alleges that Howard subsequently forged the logbook to reflect that the repairs had been completed. *Id.* at 9.

Later, following the report that patients who had been dialyzed on machine # 24 became ill, the plaintiff asserts that he informed his second-line supervisor and Howard's direct supervisor, Helen Grace Tagunicar, about Howard's request that the plaintiff forge the hours in the logbook for machine # 24. *Id.* at 8. Thus, the plaintiff contends that he was fired not for the alleged improper repairs that caused the patients' illnesses, but for (1) refusing to forge the logbook and (2) reporting to Tagunicar the falsifying of the logbook. *Id.* at 1. This, according to the plaintiff, is a protected activity that merits the filing of his wrongful discharge claim. The plaintiff asserts that the basis for the claim is supported by overwhelming evidence.

Specifically, evidence that Tagunicar was aware of the plaintiff's refusal to forge the logbook; that Tagunicar participated in the discussions to terminate the plaintiffs; that the plaintiff's termination came within days of reporting his refusal to falsify the logbooks; and that Howard, who actually repaired machine # 24, was not terminated. Pl.'s Opp'n at 23.

Based on this evidence, the plaintiff filed this lawsuit in the District of Columbia Superior Court alleging wrongful discharge in violation of public policy. The defendants' removed the case to this Court pursuant to 28 U.S.C. § 1441(b), which vests jurisdiction in this Court because the plaintiff is a District of Columbia resident, the defendants are all incorporated and have their principle place of business in other jurisdictions, and the plaintiff seeks more than $75,000 in damages. Notice and Grounds for Removal ¶ 6. The defendants now move for summary judgment under Federal Rule of Civil Procedure 56(c).

## II. *Standard of Review*

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits or declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party. *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C.Cir.1992). However, the non-moving party cannot rely on "mere allegations or denials . . . but must set forth specific facts demonstrating that there are genuine issues for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citation omitted). Under Rule 56,

"if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial" summary judgment is warranted. *Hazward v. Runyon*, 14 F.Supp.2d 120, 122 (D.D.C.1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The party moving for summary judgment bears the burden of establishing the absence of evidence to support the non-moving party's case. *Id.* In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## III. *Legal Analysis*

In their current motion, the defendants move for summary judgment alleging that the plaintiff's claim for wrongful discharge in violation of public policy must fail because (1) the plaintiff has not established facts to support a causal connection between his alleged protected activity and his termination because the individuals who made the decision to terminate him had no knowledge of his protected activities prior to making their decision and (2) the plaintiff cannot demonstrate that his alleged protected activity was the sole, or even a significant, reason for his termination. Additionally, the defendants contend that the plaintiff cannot establish a basis for an award of either punitive damages or attorney's fees. Defs.' Mem. at 1–2.

(A) **Has the Plaintiff Established a *Prima Facie* Case for Wrongful Discharge?**

Under District of Columbia law, it is a general rule that "an employer may discharge an at-will employee at anytime and for any reason, or no reason at all." *Adams v. George W. Cochran & Co., Inc.,*

597 A.2d 28, 30 (D.C.1991) (citing *Wemhoff v. Investors Mgmt. Corp.*, 528 A.2d 1205, 1208 n. 3 (D.C.1987)). However, in *Adams*, the District of Columbia Court of Appeals first recognized an exception to this general rule, concluding that the wrongful discharge of an employee in violation of public policy was an intentional tort. *Id.* at 34. The *Adams* court recognized that under this exception, "a discharged at-will employee may sue his or her former employer for wrongful discharge when the *sole reason* for the discharge is the employee's refusal to violate the law ...." *Id.* (emphasis added). The court made clear that this was a "very narrow" public policy exemption to the at-will doctrine. *Id.* The holding in *Adams* was later clarified by the District of Columbia Court of Appeals in *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C.1997) (en banc). In *Carl*, the court permitted a limited expansion of the public policy exception to the at-will employment doctrine, concluding that "the 'very narrow exception' created in *Adams* should not be read in a manner that makes it impossible to recognize any additional public policy exceptions to the at-will doctrine that may warrant recognition." *Id.* at 160. Thus, the court in *Carl*, while not altering the *Adams* sole factor requirement, opened the door for the recognition of additional exceptions to the at-will doctrine.

■ To state a claim under this public policy exception enunciated in *Adams*, the plaintiff must show that he (1) engaged in a protected activity, *i.e.*, refused to violate the law; (2) the employer took an adverse personnel action against him; and (3) there was a causal connection between the two. *See, e.g., Taylor v. Washington Metro. Area Transit Auth.*, 109 F.Supp.2d 11, 16 (D.D.C.2000). The plaintiff alleges, and the defendants do not dispute, that he was an at-will employee and has satisfied the first two prongs of the *Adams* exception.[3] The defendants move for summary judgment on this claim because they contend that the plaintiff has not established facts to support a causal connection between his alleged protected activity and his termination. They base their position on the premise that the individuals who made the decision to terminate the plaintiff had no knowledge of the plaintiff's protected activity prior to making their decision. Defs.' Mem. at 13. Additionally, the defendants contend that the plaintiff cannot show that his alleged protected activity was the sole, or even a significant, reason for his termination, as required by *Adams*. Defs.' Mem. at 16.

**(1) Has the Plaintiff Established Facts to Support a Finding that There is a Causal Connection Between his Protected Activity and his Termination?**

■ The plaintiff first opines that summary judgment is not appropriate in this

---

**3.** The plaintiff argues that he has satisfied the first prong of the exception because the falsification of records associated with the delivery of dialysis services is a violation of both federal and District of Columbia law when made in an effort to retain Medicare or Medicaid certification. *See* 42 U.S.C. § 1320a–7b(c) (stating that a person is guilty of a felony if he knowingly and willfully makes false statements or representations with respect to the condition or operation of institutions that require certification); D.C.Code § 4–802(b)(1) (a person is guilty of a misdemeanor if he makes a false statement with the intent to defraud in order to remain a provider). Pl.'s Opp'n at 3. Thus, because of his alleged refusal to violate these provisions of the law and his discussions with Tagunicar about the matter, the plaintiff contends, and the defendants do not dispute, that he has satisfied the first prong of the *Adams* exception. *Id.* Furthermore, the plaintiff has satisfied the second prong of the test because he was terminated, which is clearly an adverse personnel action. *Adams*, 597 A.2d at 29.

case because he has satisfied the burden of demonstrating a causal link between his protected activity and his termination. According to the plaintiff, because (1) his termination occurred only a few days after he engaged in the protected activity and (2) he has established that the "company" had knowledge of his protected activity, his wrongful discharge claim should survive the defendants' motion for summary judgment. Pl.'s Opp'n at 25–26. The plaintiff posits that these facts, standing alone, require that this Court deny the defendants' motion for summary judgment. Id. at 25. The plaintiff's arguments, however, are clearly contrary to the case law in this jurisdiction.

In *Hazward*, the court specifically rejected the theory that mere proximity in time to the protected activity and the adverse employment action is sufficient to satisfy the causation element. 14 F.Supp.2d at 124–25. As the court in *Hazward* stated, "[a] showing of mere temporal proximity, without more, fails to demonstrate the required causal connection between the protected activity and the adverse employment action." *Id.* Furthermore, the case law in this jurisdiction requires that the plaintiff demonstrate that the *decision maker(s)* were aware of the protected activity, not just some *employee of the company*. *Buggs v. Powell*, 293 F.Supp.2d 135, 150–51 (D.D.C.2003) and cases cited therein (concluding that the plaintiff was unable to establish a *prima facie* case of retaliation because the *selecting official* was unaware of the protected activity); *Laboy v. O'Neill*, 180 F.Supp.2d 18, 26 (D.D.C.2001) (holding that summary judgment was appropriate when the plaintiff failed to demonstrate that the *decision maker* had knowledge of the protected activity). Accordingly, as a matter of law, a causal connection cannot exist solely based on the temporal proximity of his protected

activity to his termination and general "company" knowledge of his protected activity. *See Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985) (stating that the causal connection may be established by "showing that the employer had knowledge of the employee's protected activity, *and* that the adverse personnel action took place shortly after that activity.") (emphasis added).

Next, the plaintiff argues that summary judgment is not appropriate in this case because there are material facts in dispute regarding whether the individuals who decided to terminate him were aware of his alleged protected activity. Pl.'s Opp'n at 26. The defendants contend that the uncontradicted evidence establishes that only Ward and Nazarko made the decision to terminate the plaintiff. Defs.' Reply at 6. Thus, since there is no evidence that either Ward or Nazarko had knowledge of the protected activity, the defendants maintain that the plaintiff has failed to establish an essential element of his wrongful discharge claim and summary judgment in their favor is appropriate. Defs.' Mem. at 13–16. The plaintiff counters that the evidence shows (1) that Tagunicar knew of the plaintiff's protected activity and (2) that she participated in the discussions surrounding the termination, thus making the entry of summary judgement inappropriate. Pl.'s Opp'n at 26. After a careful review of the parties' papers, the interrogatories, and the exhibits presented to the Court, the Court agrees with the plaintiff that summary judgment is not appropriate because there are material facts in dispute that must be resolved by a jury, and not by this Court.

According to the plaintiff, he informed several individuals of Howard's instruction to forge the hours in machine # 24's logbook. Specifically, Owens claims he told Mildred Mims, the facility's Social Worker;

Carolyn Nelson, a secretary at the Northeast facility; and Tagunicar about Howard's instruction. Def's Mem. at 8–9; Owens Deposition, Pl.'s Ex. 45 at 154–57, 178–79; Mims Declaration, Pl.'s Ex. 16. Thus, the plaintiff opines that if he has presented facts which support his position that Mims, Nelson, or Tagunicar participated in the decision making process which led to his termination, summary judgment is not appropriate. Pl.'s Opp'n at 26. The plaintiff directs this Court to the Defendants' Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents ("Interrogatory Responses"), Pl.'s Ex. 27, specifically Interrogatories 2 and 15.[4]

Interrogatory 2 asked the defendants to "identify all persons who participated in the decision to terminate Mr. Owens, and separately for each such person describe in detail that person's role in the decision, including but not limited to the substance of his/her input, decisions, actions, and communication relating to Mr. Owens' termination." In response, the defendants stated: "Medical Director Dr. Javed Rahmat, Facility Administrator Robert Ward, Regional Manager Jennifer Nazarko, *and Facility Director of Nursing Helen Grace Tagunicar met to discuss the situation.* Rahmat, Ward, and Nazarko made the decision to terminate Plaintiff, and Ward informed Plaintiff of that decision." Interrogatory Responses, Pl.'s Ex. 27 at 4–5 (emphasis added). The defendants' response to interrogatory 15 states that "Facility Administrator Bob Ward received the investigative summaries of these incidents and made the decision to terminate

Plaintiff, along with Dr. Javed Rahmat and Jennifer Nazarko. *Helen Grace Tagunicar also participated in these discussions.*" *Id.* at 16 (emphasis added). Based on these responses, the plaintiff contends that there are facts to support a finding that Tagunicar participated in the discussions surrounding the plaintiff's termination. Pl.'s Opp'n at 27–28. Thus, since there are also facts to support a finding that Tagunicar was aware of the plaintiff's protected activity, it is a reasonable conclusion that Tagunicar made the decision makers aware of the plaintiff's protected activity during these discussions. *Id.* at 27–28. Therefore, according to the plaintiff, these facts preclude the entry of summary judgment. In response, the defendants first note that contrary to the plaintiff's testimony, Tagunicar and Nelson both testified that the plaintiff never informed them about Howard's alleged instruction to forge the hours in the logbook. Tagunicar Dep., Exhibits to Defendants' Motion for Summary Judgment ("Defs.' Ex.") 9 at 236–37; Nelson Declaration, Defs.' Ex. 7 at 1–2. Furthermore, the defendants contend that reliance on the responses to the interrogatories is misplaced because Ward, who provided the information to respond to the interrogatories, later "credibly" clarified these responses during his deposition. Specifically, the defendants note that Ward stated that the responses to the interrogatories were inaccurate because "he mistakenly believed that the interrogatories asked him to provide the names of all individuals who ever discussed Plaintiff's terminations, rather than just the names of individuals

---

4. The plaintiff also references Interrogatory 1, where the defendants stated, in response to the question of why Owens was fired, that "Brawner reported these findings to the Facility Administrator Bob Ward, Medical Director Dr. Javed Rahmat, Regional Manager Jennifer Nazarko, and Facility Director of Nursing Helen Grace Tagunicar .... When *they* confronted Plaintiff with these findings, he merely repeated that he had performed the proper checks. Due to the overwhelming evidence to the contrary, Defendant terminated his employment." Interrogatory Responses, Pl.'s Ex. 27 at 3–4 (emphasis added).

who participated in the termination decision."[5] Ward Dep., Pl.'s Ex. 39 at 206–09.

To the extent that there is conflicting testimony regarding who the plaintiff told about his refusal to forge the logbooks, a jury, not this Court must weigh the evidence and make the appropriate credibility determinations. *See Reeves*, 530 U.S. at 150, 120 S.Ct. 2097. Furthermore, the jury, not this Court, must review such conflicting testimony and evidence to determine what weight, if any, should be accorded the later clarification of the defendants' responses to the plaintiff's interrogatories.[6] This Court's authority at this stage of the litigation is limited to determining whether the plaintiff has established facts to support each element of his claim. Viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, as this Court is required to do, it is clear that contrary to the defendants' assertion, the plaintiff has set forth evidence sufficient to support a finding that there was a causal connection between the plaintiff's protected activity and his termination.

First, it is not disputed that the plaintiff's termination occurred only days after he engaged in the alleged protected activity. Furthermore, the plaintiff has set forth facts showing that Tagunicar (1) knew of the alleged protected activity and (2) was a participant in the discussion that resulted in his termination. Because Tagunicar may have participated in the discussion, it is reasonable to infer that she would have informed Ward and Nazarko about the plaintiff's protected activity and that her revelation influenced their final decision to terminate his employment. This is simply not the type of case where

---

**5.** At trial, Ward's deposition testimony statement would likely be admissible "not only for impeachment purposes, but also as substantive evidence." *Barwick v. United States*, 923 F.2d 885, 888 (D.C.Cir.1991) (citing Fed. R.Evid. 801(d)(1)(A); *Harley–Davidson Motor Co. v. Bank of New England*, 897 F.2d 611, 615 (1st Cir.1990) (noting that where the defendant had impeached plaintiff's expert by pointing to inconsistent statements in his deposition, such statement were also admissible as substantive evidence.)). And the statement will likely be admissible as substantive evidence because it qualifies as a statement against interest under Federal Rule of Evidence 804(b)(3).

**6.** The defendants argue that they are not bound by the initial responses to the interrogatories, but can amend them and clarify the responses if necessary during the pendency of the case. Defs.' Reply at 8. The defendants' cite to *Hinks v. Graco, Inc.*, 1993 WL 350193, 1993 U.S. Dist LEXIS 12412 (E.D.Ill.1993) as support for this proposition. A careful reading of this case, however, does not confirm the defendants' position. In *Hinks*, the plaintiff filed a products liability action claiming that he was injured while on the job using painting equipment manufactured by the defendant. *Id.* The plaintiff's complaint and responses to interrogatories indicated that a particular product that caused his injury, however, after a motion for summary judgment was filed, the plaintiff filed an amended answer to the interrogatory and an affidavit identifying a different product. *Id.* The court concluded that the amended answer and the affidavit created a factual dispute thus rendering summary judgment inappropriate. *Id.* In creating this disputed fact, the court noted that "[w]hile [the plaintiff] has created large issues of credibility with his inconsistent positions, he must be allowed to explain these inconsistencies at trial." *Id.* Thus, the *Hinks* court did not permit the plaintiff to escape the potential impact on his credibility resulting from the incorrect answer that was initially provided to the interrogatory, it simply permitted him to avoid summary judgment based on the newly disputed facts and left to a jury the question of whether the initial or the later response should be credited. Applying this rationale here, it is the jury, not this Court, that should determine whether Ward "credibly" amended the answers to the interrogatories through his deposition testimony.

the supervisor who had knowledge of the protected activity clearly played *no* part in the discussions or decision regarding the termination, which would warrant entry of summary judgment.[7] *See, e.g., Hall v. Giant Food, Inc.,* 175 F.3d 1074, 1079–80 (D.C.Cir.1999) (concluding summary judgment was warranted in the defendant's favor because the plaintiff offered "no evidence that [his supervisor] recommended to [the final decision maker] that [the plaintiff] be discharged, that [the supervisor] was sufficiently involved to be aware of [the decision maker's] reason for terminating [the plaintiff] or that [the supervisor] had the ability to influence [the decision maker's] decision.").

Based upon the circumstances in this case, the Court concludes that the plaintiff has presented sufficient evidence to survive the defendants' motion for summary judgment. This conclusion is called for because the facts presented by the plaintiff satisfy the third-prong—the causation prong—of the wrongful discharge claim since the facts demonstrate that the "employer had knowledge of the employee's protected activity *and* that the adverse personnel action took place shortly after that activity." *Mitchell,* 759 F.2d at 86.

**(2) Has the Plaintiff established that his Protected Activity was the sole or a significant factor in his termination?**

▮ The defendants next argue that the plaintiff's claim for wrongful termination in violation of public policy must fail because the plaintiff has not set forth facts that his alleged protected activity was the *sole* reason for his termination.[8] Defs.' Mem. at 16–18. In *Adams,* as further clarified in *Carl,* District of Columbia law permits a claim for wrongful termination if the *sole* reason for the termination was because the plaintiff refused to violate the law. *Carl,* 702 A.2d at 160; *Adams,* 597 A.2d at 34.

The defendants' contend that the plaintiff's deposition testimony forecloses a finding that his alleged refusal to forge the logbook and his complaint to Tagunicar were the sole reasons for his termination. Defs.' Mem. at 17–18. The defendants direct the Court to the plaintiff's testimony where he stated he was terminated "[t]o cover up somebody else's mistake. Somebody had to take the fall because of the five patents being injured." Owens Deposition, Defs.' Ex. 1 at 208–09. The plaintiff then stated that he believed he was the "scapegoat" and "fall guy" for the mistake. *Id.* Later in his deposition during cross-

---

7. It is noteworthy that although the defendants deny that Howard participated in the decision to terminate the plaintiff, Ward nonetheless testified that his practice was for an employee's supervisor to be involved in disciplinary decisions. *See, e.g.,* Ward Deposition, Pl.'s Ex. 39 at 69, 319–20. Whether or not that occurred here is yet another credibility determination for the jury to make.

8. The plaintiff contends that the test should be whether the plaintiff's protected activity was the sole *or* a significant factor leading to his termination. Pl.'s Opp'n at 40–42. To support this proposition, the plaintiff cites *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 886 n. 25 (D.C.1998), where the District of Columbia Court of Appeals seemed to indicate that *Carl,* by permitting

two claims to proceed under the wrongful termination doctrine even through only one was sufficient to invoke the exception, relaxed the sole factor requirement. *Id.* (citing *Carl,* 702 A.2d at 165 (Terry, J., concurring), 186 (Schwelb, J., concurring)). However, *Carl* addressed only whether the District of Columbia would recognize any additional public policy exceptions to the at-will doctrine. The court was not presented with the question of whether the "sole" factor requirement should be relaxed or altered. *See, e.g., Mandsager v. Jaquith,* 706 A.2d 39, 41 n. 5 (D.C.1998). In fact, subsequent cases applying the *Adams/Carl* reasoning have employed only the *sole* factor test. *See, e.g., Liberatore v. CVS,* 160 F.Supp.2d 114, 117 (D.D.C.2001).

examination, the plaintiff, after reviewing his complaint, stated that he was fired because he "refus[ed] to falsify documentation" and for refusing to participate in other improper practices that violate "a couple of policies [and] regulations of the District of Columbia." *Id.* at 249–50. The defendants argue that the plaintiff's initial testimony indicates that he believed he was fired as a result of the defendants' desire to pin the blame on someone and to cover-up for another person's mistakes, not that he was fired because he refused to forge the logbook and had informed Tagunicar of the request that he do so. Defs.' Mem. at 18. While this could be one interpretation of the plaintiff's deposition testimony, a jury could also conclude that the plaintiff was saying he had been targeted as the "scapegoat" because he had refused to forge the logbook for machine # 24 to conceal the mistake that injured the patients who were treated with the machine. The plaintiff's deposition testimony is far from clear and any discrepancies in the testimony, perceived or actual, necessitates a credibility determination, which this Court is prohibited from making. For these reasons, the defendants' argument must fail.

Furthermore, the defendants contend that they were justified in terminating the plaintiff because they had a legitimate reason to believe that the plaintiff had improperly repaired machine # 24 (based on Brawer's report) and left it in an unsafe condition. Defs.' Mem. at 16. Thus, according to the defendants, because there was a legitimate reason to terminate the plaintiff's employment, he is precluded

from bringing a wrongful discharge action. *Id.* However, this Court has already concluded that there are facts in the record that support a finding that Tagunicar had knowledge of the protected activity and that she was part of the discussions regarding the plaintiff's termination. *See supra* III.A.1 at 9–14. Thus, it is squarely within the province of the jury to infer that since Tagunicar knew of the alleged protected activity and participated in the discussions to terminate the plaintiff, that she informed the final decision makers (Ward and Nazarko) of the alleged protected activity. Therefore, the jury would simply be drawing a fair and permissible inference if it concluded that based on the foregoing, and the fact that the plaintiff was terminated only days after he informed Tagunicar of the protected activity, that the sole reason for the plaintiff's termination was because of his alleged protected activity.[9] *See Liberatore v. CVS New York*, 160 F.Supp.2d 114, 117 (D.D.C. 2001) (stating that it was reasonable for a jury to infer that the plaintiff's supervisor told the management about the plaintiff's alleged whistleblowing threat, despite his denial to the contrary).

In *Liberatore*, a terminated pharmacist brought a wrongful discharge action against his former employer, CVS. *Id.* at 114. The plaintiff alleged that his former employer had wrongfully terminated him because he had threatened to inform the Food and Drug Administration ("FDA") of the improper storage of prescription drugs. *Id.* at 114–15. The jury found for the plaintiff and the defendant moved for judgment as a matter of law, a new trial,

---

9. In his opposition, the plaintiff discusses for several pages facts he contends support a finding that the reason given for his termination was pretextual. Because this Court concludes that the plaintiff's wrongful discharge claim survives the motion for summary judgment based upon the reasonable conclusion that Tagunicar knew of the alleged protected activity, was involved in the discussions surrounding the plaintiff's termination, and the adverse action took place only days after the alleged protected activity took place, this Court need not consider the plaintiff's pretext claim.

or remittitur. *Id.* The defendant alleged that the plaintiff failed to meet his burden of establishing that his termination was based *solely* on his whistleblowing threat because he had admitted that he was practicing pharmacy without a license and misrepresented that fact to his employer. *Id.* at 117. The defendant alleged that they had a policy to terminate any pharmacist determined to be practicing without a license. *Id.* Despite this policy, the court concluded that "[t]he weight of the evidence ... is affected by the jury's assessment of the witnesses' credibility." *Id.* at 117–18. In conducting this review, the court held that it was reasonable for the jury to conclude that the sole reason for the pharmacist's termination was his threat to report CVS to the FDA, even though he could have been terminated based on his expired pharmacy license. *Id.* at 118. Despite the different procedural posture, *Liberatore* clearly supports this Court's holding that even if there is a plausible legal reason for the plaintiff's termination, the jury, after reviewing the evidence and making the necessary credibility determinations, could still conclude that the sole reason for his termination was because of the alleged protected activity.

## (B) Are Punitive Damages Awardable on a Claim of Wrongful Discharge?

 The defendants' argue that the plaintiffs's claim for punitive damages must be dismissed because the District of Columbia has not yet recognized punitive damages in cases of wrongful discharge in violation of public policy. Defs.' Mem. at 19. Specifically, the defendants' cites *Adams,* where the District of Columbia Court of Appeals held that the compensatory damages and damages for emotional distress were recoverable, but that it would leave for "another day" whether "punitive damages are available in an ac-

tion for wrongful discharge." *Adams,* 597 A.2d at 34–35 n. 10. Although the defendants correctly note that the highest court of the District of Columbia has not yet ruled that punitive damages can be recovered on a wrongful termination claim, that does not mean this Court must dismiss the plaintiff's claim for such relief. This is because "[t]he Court 'must determine issues of state law as it believes the highest court of the state would determine them, not necessarily (although usually this will be the case) as they have been decided by other state courts in the past.'" *Thomas v. City Lights School, Inc.,* 124 F.Supp.2d 707, 709 (D.D.C.2000) (citing Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civil 2d § 507 at p. 130 (2d ed.1996); *Independent Petrochemical Corp. v. Aetna Cas. and Sur. Co.,* 944 F.2d 940, 944 (D.C.Cir.1991)).

 Wrongful termination in violation of public policy is an intentional tort under District of Columbia law. *Adams,* 597 A.2d at 34. Under District of Columbia law, punitive damages are available in actions arising from intentional torts. *See, e.g., Jemison v. National Baptist Convention, U.S.A., Inc.,* 720 A.2d 275, 285 n. 9 (D.C.1998) ("In the District of Columbia, with rare exceptions, punitive damages are available only for intentional torts"); *Robinson v. Sarisky,* 535 A.2d 901, 906–07 (D.C.1988) ("[p]unitive damages are available in actions for intentional torts"). The basic purpose of punitive damages is to deter and punish. *Robinson,* 535 A.2d at 907. Such damages are not based on actual damages, but rather upon the intent in which the wrong was done. *Id.* To succeed on a claim for punitive damages arising from an intentional tort, the plaintiff must establish that the tortious act was committed with an "'evil motive, actual malice, deliberate violate or oppression' ... or for 'outrageous conduct ... in will-

ful disregard for another's rights.'" *Id.* at 906. (internal citations omitted). "The requisite state of mind need not (and usually cannot) be proven by direct evidence, but may be inferred from all the facts and circumstances of the case." *Id.* (citations omitted). "Once the necessary malice is established, the amount of punitive damages is left to the jury's discretion." *Id.* (citations omitted). The question before this Court, and one that has not been answered by the District of Columbia Court of Appeals, is whether punitive damages are available for the intentional tort of wrongful discharge in violation of public policy.

 It is this Court's opinion that the District of Columbia Court of Appeals will conclude that punitive damages may be awarded for the intentional tort of wrongful discharge based on public policy. In *Adams,* the court specifically decided to follow the majority-rule and held that wrongful discharge is an intentional tort. *Adams,* 597 A.2d at 34. In so concluding, the court wrote, albeit in dicta, that "[b]ecause the goal of the exception is to further an officially declared public policy, the law should allow for the *full range of remedies to discourage employers from such conduct.*" *Id.* (emphasis added). Thus, because the District of Columbia recognizes that punitive damages are available for intentional torts, and since punitive damages are designed to deter and punish wrongdoers, the Court believes that the District of Columbia Court of Appeals would conclude that punitive damages are part of the "full range of remedies to discourage employers from" wrongfully discharging employees when doing so is in violation of public policy.

 Furthermore, numerous other courts have recognized that punitive damages may be awarded on such a claim. *See, e.g., Adler v. American Standard*

*Corp.,* 538 F.Supp. 572, 580 (D.Md.1982) (refusing to dismiss a claim for punitive damages for tort of abusive discharge based on the plaintiff's claim that he had been discharged after threatening to expose violation of federal statute); *Little v. Auto Stiegler Inc.,* 29 Cal.4th 1064, 130 Cal.Rptr.2d 892, 63 P.3d 979, 990 (2003) (punitive damages are available for intentional tort of wrongful termination in violation of public policy); *Simpson County Steeplechase Ass'n, Inc. v. Roberts,* 898 S.W.2d 523, 526 (Ky.Ct.App.1995) (same); *Thompson v. Better–Bilt Aluminum Products Co., Inc.,* 171 Ariz. 550, 832 P.2d 203, 208 (1992) ("In appropriate circumstances, punitive damages may be recovered in an action for wrongful discharge in violation of public policy"); *Willard v. Paracelsus Health Care Corp.,* 681 So.2d 539, 542–43 (Miss.1996) (recognizing that punitive damages for wrongful discharge in violation of public policy might be available if the facts of the case warrant such damages); *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569, 572 (Minn.1987) (in some cases punitive damages are available for claims of wrongful termination in violation of public policy); *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505, 512–13 (1980) (same). Thus, based on the foregoing, the Court concludes that, in the District of Columbia, punitive damages are available for claims of wrongful discharge in violation of public policy. Moreover, in this case, the plaintiff has set forth claims, which if true, indicate a cover-up that could cause death or serious injury to already sick individuals. This is precisely the type of situation where courts have concluded that punitive damages are an appropriate remedy to deter and punish such outrageous behavior. *See, e.g., Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580, 583 (D.C.1985) ("The purpose of punitive damages is to punish a person for

outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights.").

Thus, the next question this Court must address is whether the plaintiff has met his burden in establishing, based upon the facts and circumstances, that such an award is appropriate in this case. As noted, to succeed, the plaintiff must show that the defendant has acted with " 'evil motive, actual malice, deliberate violate or oppression' . . . or for 'outrageous conduct . . . in willful disregard for another's rights.' " *Robinson*, 535 A.2d at 906. (internal citations omitted). As already discussed, this Court has concluded that the plaintiff has presented facts that can support a finding that the decision makers were aware of the plaintiff's protected activity before they made their decision to terminate his employment.[10] *See supra* III.A.1 at 9–14. Based upon the allegations in this case, a reasonable jury could conclude that the defendants, when deciding to terminate the plaintiff, acted maliciously, willfully and oppressively or in complete disregard for the plaintiff's rights, which would support a punitive damage award. *See, e.g., H.S. v. Board of Regents*, 967 S.W.2d 665, 672 (Mo.Ct.App.1998) (punitive damages have been sustained when the court has found that the decision makers participated in the discriminatory act and treated the plaintiff different than others). Therefore, if the plaintiff is able to develop the evidence at trial as now alleged, the Court concludes that there will be an adequate factual basis for an award of punitive damages.

### (C) Is an Award of Attorney's Fees Appropriate?

■■■ Finally, the defendants contend that the plaintiff is not entitled to an award of attorney's fees. Defs.' Mem. at 24–25. As a general matter, the District of Columbia "follows 'the American Rule under which . . . "every party to a case shoulders its own attorneys' fees, and recovers from other litigants only in the presence of statutory authority, a contractual arrangement, or certain narrowly-defined common law exceptions," such as the conventional "bad faith" exception.' " *Oliver T. Carr Co. v. United Techs. Comm. Co.*, 604 A.2d 881, 883 (D.C.1992) (citations omitted). "One of the common law's narrow exceptions to the American Rule, under which each party pays its own fees, permits awards against a losing party who has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' " *Swedish Hosp. Corp. v. Shalala*, 845 F.Supp. 894, 897–98 (D.D.C.1993). And because this case is not governed by a contract or a statute, the only way the plaintiff will be entitled to attorney's fees is if he can establish facts that support a finding of, for example, bad faith.

■■■ In any event, the defendants' motion for summary judgment on the plaintiff's claim for attorney's fees is premature at this point in the litigation. A necessary predicate for an award of attorney's fees is whether the party seeking the fees is a prevailing party. Obviously, that determination has not yet been made. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1369 (Fed.Cir.2004) ("At the pretrial stage,

---

10. The plaintiff also asserts that there was disparate in treatment of the various individuals involved in the maintenance of machine # 24. Pl.'s Opp'n at 36–37. Specifically, the plaintiff contends that Howard, who the plaintiff opines violated company policy by actually forging the hours in the logbook, was

not terminated, only reprimanded. *Id.* The plaintiff contends that this provides further support for his contention that the defendant' representation that he was terminated for allegedly improperly repairing machine # 24 was a pretext for the actual reason he was discharged. *Id.*

there is no prevailing party, and thus, any claim for attorneys' fees would be premature."). Furthermore, to the extent that there are factual issues that must be resolved, *i.e.*, whether the defendants acted in bad faith, a determination of whether attorney's fees should be awarded is not appropriate until after those issues are resolved, which cannot take place until after the evidence has been presented at trial. *Taylor Made Golf Co., Inc. v. MJT Consulting Group,* 265 F.Supp.2d 732, 749 (N.D.Tex.2003); *see also Music Sales Corp. v. Morris,* 73 F.Supp.2d 364, 381 (S.D.N.Y.1999) (motion for attorney's fees is premature since court's determination on motion for summary judgment did not dispose of the case). Moreover, even though a request for attorney's fees is not warranted at this stage in the litigation, later developments may justify such a request. *Burrell v. State Farm and Cas. Co.,* 226 F.Supp.2d 427, 441 (S.D.N.Y. 2002). For the foregoing reasons, the defendants' motion to dismiss on this issue must be denied as premature.

### IV. *Conclusion*

For the foregoing reasons, this Court must deny the defendants' motion for summary judgment. As elaborated above, the plaintiff has presented material disputed facts that support each element of a claim for wrongful discharge based on public policy. Additionally, punitive damages are available on this claim if the plaintiff is able to present sufficient facts for a jury to make such an award. Finally, it is premature for the Court to determine whether the plaintiff is entitled to attorney's fees.[11]

---

11. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.